**In re MARVEL ENTERTAINMENT GROUP, INC.; The Asher Candy Company; Fleer Corp.; Frank H. Fleer Corp.; Heroes World Distribution, Inc.; Malibu Comics Entertainment, Inc.; Marvel Characters, Inc.; Marvel Direct Marketing Inc.; and Skybox International, Inc., and Marvel Enterprises, Inc., Debtors.**

**Marvel Entertainment Group, Inc.; MEI Holding Co. F; MEI Holding Co. FHF MEI Holding Co. S; Malibu Comics Entertainment Inc.; Marvel Characters, Inc.; and Marvel Enterprises, Inc., Plaintiffs,**

v.

**MAFCO Holdings, Inc.; Marvel III Holdings Inc.; Marvel (Parent) Holdings, Inc.; Marvel Holdings Inc.; Ronald O. Perelman; William C. Bevins; and Donald G. Drapkin, Defendants.**

**Civ.A. Nos. 97–638–RRM, 98–756–RRM.**

United States District Court, D. Delaware.

Feb. 6, 2002.

David B. Stratton, M. Duncan Grant,
Andrea B. Unterberger, Joseph S. Naylor,
Pepper Hamilton, LLP, Wilmington, DE,
for plaintiffs.

Anthony W. Clark, Eric M. Davis, Paul
J. Lockwood, Skadden, Arps, Slate,
Meagher & Flom, LLP, Wilmington, DE,
Robert E. Zimet, Susan L. Saltzstein,
W.H. Ramsay Lewis, Skadden, Arps,
Slate, Meagher & Flom, LLP, New York
City, for defendants.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a dispute between a parent and subsidiary over a tax-sharing agreement involving claims for breach of fiduciary duty, breach of contract, fraudulent conveyance, and avoidable transfer under the Bankruptcy Code. Plaintiff Marvel Entertainment Group, Inc. is a Delaware corporation and is the reorganized debtor in case number 97–638–RRM, pending in this court ("the Marvel bankruptcy case"). Plaintiffs MEI Holding Company F. Corp. (formerly known as Fleer Corp.), MEI Holding Co. FHF (formerly known as Frank H. Fleer Corp.), MEI Holding Company S Corp. (formerly known as Skybox International Inc.), Marvel Characters, Inc., and Malibu Comics Entertainment Inc. are each Delaware corporations, reorganized debtors in the Marvel bankruptcy case, and direct or indirect subsidiaries of Marvel Entertainment. In 1998, Marvel Entertainment was merged into a holding company controlled by Toy Biz, Inc. Subsequently, Toy Biz changed its name to Marvel Enterprises. Plaintiff Marvel En-

terprises, Inc. is a Delaware corporation. In this opinion, the court will refer to the plaintiffs collectively as the Marvel Group.

Defendant Mafco Holdings, Inc. is a Delaware corporation. During the time period relevant to this dispute, May 19, 1993 through April 24, 1997, Mafco's indirect ownership of Marvel Entertainment exceeded 80%. By virtue of its direct and indirect ownership of a majority of Marvel Entertainment's issued and outstanding stock, Mafco had the ability to participate in the determination of the size and elect all members of Marvel Entertainment's board of directors. Defendants Marvel III Holdings, Inc., Marvel Holdings Inc., and Marvel (Parent) Holdings Inc. (collectively, "the Marvel Holdings Companies") are direct or indirect subsidiaries of Mafco.[1] The Marvel Holdings Companies also are all former direct or indirect parent companies of Marvel Entertainment and its direct and indirect 80%-owned domestic subsidiaries. The defendant corporations (Mafco and the Marvel Holdings Companies) will be collectively referred to as the corporate defendants.

Defendants Ronald O. Perelman, William C. Bevins, and Donald O. Drapkin (collectively, "the director defendants") are former members of the board of directors of Marvel Entertainment and served on its board during the period from May 13, 1997 through April 24, 1997. During the period relevant to this dispute, Perelman held a beneficial interest in 100% of the outstanding common stock Mafco. Due to his ownership interest in Mafco, Perelman had the capability to direct Mafco with respect to its ability to determine the size and elect all members of Marvel Entertainment's board of directors. During the period from May 13, 1997 through April 24, 1997, Perelman, Bevins, and Drapkin were members of the executive committee of the Marvel Entertainment Board of Directors.

This case is an adversary proceeding of the Marvel bankruptcy case that has been filed in the district court. After filing their initial complaint on December 23, 1998, and later amending their complaint on April 22, 1999 to add claims against the director defendants, plaintiffs filed their second amended complaint on February 20, 2001. The second amended complaint alleges: (i) a state law claim against the director defendants for breach of fiduciary duties; (ii) a state law breach of contract claim against Mafco for breach of two provisions of a tax sharing agreement; (iii) a fraudulent conveyance claim against Mafco under 11 U.S.C. § 548; and (iv) an avoidable transfer claim against the corporate defendants under 11 U.S.C. § 549. All of the claims relate to a tax sharing agreement that was entered into between Mafco and Marvel Entertainment, under which Mafco used the operating losses of Marvel Entertainment in its federal income tax returns for periods when both were members of the same consolidated tax group. It is alleged that when the parties entered into the tax sharing agreement during the period of May 19, 1993 through April 24, 1997 the corporate defendants and the director defendants were in a position of conflict.

On March 2, 2001, Mafco and the director defendants moved for summary

---

**1.** The Marvel Holdings Companies are debtors in proceedings under Chapter 7 of the Bankruptcy Code and are controlled by trustees appointed thereunder. Because the Marvel Holdings Companies are in Chapter 7 proceedings and the automatic stay provision of section 362 of the Bankruptcy Code, 11 U.S.C. § 362 they have not been named as defendants to the breach of fiduciary duty claim or the breach of contract claim. They have only been named defendants to Count IV of the amended complaint, the claim for avoidable transfer under 11 U.S.C. § 549.

judgment on all the claims, arguing, among other things: (i) that plaintiffs' claims against Mafco and the director defendants fail because they are "claims related to or arising out of the Tax Sharing Agreement" which have been expressly released by Marvel Entertainment under a release agreement that was entered into between the parties; (ii) that the breach of fiduciary duty claim is barred by the statute of limitations and also fails because the plaintiffs cannot show that the Tax Sharing Agreement was unfair; (iii) that the breach of contract claim is barred by the statute of limitations and also fails because the provision at issue does not apply during taxable periods when Marvel Entertainment is no longer part of the Mafco consolidated tax group; (iv) that the avoidable transfer claims under 11 U.S.C. §§ 548, 549, and 550 fail because no "transfers" occurred during the relevant periods within the meaning of the Code; (v) that the avoidable transfer claims also fail because the post-petition actions under the tax sharing agreement were authorized by the bankruptcy court and undertaken in the ordinary course of Marvel Entertainment's business; and (vi) that all of plaintiffs' claims should fail because they have suffered no damages. Also on March 2, 2001, the defendants answered the plaintiffs' second amended complaint and filed amended counterclaims. Defendants' counterclaims allege that plaintiffs breached a stipulation and order, the release agreement, and the tax sharing agreement. Defendants' counterclaims also allege that Marvel Enterprises tortiously interfered with Mafco's contractual rights.

On March 20, 2001, the Marvel Group moved to dismiss the defendants' amended counterclaims, answered Mafco's motion for summary judgment, and filed a Rule 56(f) motion to obtain a continuance for discovery. Mafco's motion for summary judgment, Marvel Group's motion to dismiss the defendants' counterclaims, and Marvel's Rule 56(f) motion are currently pending before the court. On October 3, 2001, the court held a pre-trial conference. At the pre-trial conference the parties informed the court that, because the trial was to be a bench trial, the issues were fully briefed, and a large number of facts, especially those relating to liability, are undisputed, they would be amenable to postponing the trial, bifurcating the liability and damages issues, and having the court, with the aid of any supplemental briefing that the parties deem necessary, resolve the liability issues on the briefing. *See* Oct. 3, 2001 Pre–Trial Conf.Tr. at 6–9. Accordingly, the parties filed supplemental briefing and on October 31, 2001, the court heard oral argument on the liability issues.

This is the court's decision on Mafco's motion for summary judgment and Marvel Group's motion to dismiss the defendants' counterclaims. Because the parties agree as to the underlying facts, the court need only resolve the questions of law raised by the parties motion in order to resolve the liability issues in the case.

i. *STATEMENT OF FACTS AND BACKGROUND*

The essential facts are undisputed. The court draws the following facts from the undisputed facts section of the pre-trial order and from documents submitted in support of the parties' briefs.

A. *Net Operating Losses and Consolidated Federal Income Tax Groups*

Because the claims asserted in this case concern Mafco's use of net operating losses (NOLs) generated by Marvel Entertainment in federal income tax returns filed by Mafco for periods during which both were members of the same consolidated tax group, it will be instructive to briefly re-

view the Internal Revenue Code rules governing the use of NOLs, consolidated tax groups, and the use of NOLs by consolidated tax groups.

## 1. Net Operating Losses

NOLs occur when a corporation's operating losses exceed income. In such instances, corporate taxpayers are entitled to deduct NOL carryovers and NOL carrybacks in determining their taxable income in each taxable year. Carrying back NOLs for that purpose entitles the taxpayer to a refund of taxes attributable to the prior year's income offset by the carryback. *See* Internal Revenue Code, § 172. When carrying back NOLs, the taxpayer must first apply the NOLs to the oldest tax year to which it is permitted to carry back NOLs and in which it had reported income. *See id.* The taxpayer's income for a given tax return year could be reduced to zero if the NOLs carried back are large enough to cancel out income entirely for that year. Under IRS regulations during the period relevant to this dispute, NOLs incurred by a corporation could be carried back three years and could also be carried forward for fifteen taxable years.

## 2. Consolidated Tax Groups

A consolidated group of corporations consists of one parent corporation that owns, directly or indirectly, 80% or more, by vote and value, of the other corporations in the group. 26 U.S.C. § 1504(a). The Internal Revenue Code of 1986, as amended ("the IRC"), and the Treasury Regulations promulgated thereunder, permit, but do not require, a parent corporation to file one consolidated federal income tax return on behalf of all members of the consolidated group that includes the parent's own income and the income of each of its domestic subsidiaries of which the par-

ent corporation owns 80% or more of the stock by vote and value.

If a parent corporation elects to file a consolidated federal income tax return, it must, with certain exceptions not relevant here, include in all such tax periods the gains and losses of all of its domestic subsidiaries in which it owns at least 80% by vote and value. When a parent corporation and its subsidiaries file a consolidated federal income tax return, each corporate entity in the consolidated group first calculates its taxes as if it were a stand-alone taxpayer (with certain consolidating adjustments), and the gains and losses are then combined to determine the consolidated group's federal income tax liability. Thus, under the IRC and Treasury Regulations, a consolidated group is permitted to file one federal income tax return on behalf of all members of the consolidated group that reflects the income, losses, gains, deductions, and credits of all the members as if they were a single business enterprise conducted by one corporation. *See* Crestol, Hennessey & Yates, *The Consolidated Tax Return* at 1–2 (Warren, Gorham & Lamont 5th ed.1998).

## 3. The Use of Member NOLs by Consolidated Tax Groups

As described above, consolidated tax returns allow the corporate taxpayer to offset the taxable gains of one member corporation against the operating losses of another member corporation in determining the tax liability of the group. However, when a NOL generated by a member of a consolidated tax group is absorbed by the group, a member of the group owning stock in the subsidiary that generated the NOL must reduce its basis in the stock of that subsidiary by the amount of the NOL absorbed. *See* Treasury Regulations, § 1.1502–19. If the subsidiary continues to generate NOLs that are absorbed by the

group, the subsidiary's losses can continue to be deducted against the other member's taxable income even after the stock basis in the subsidiary is reduced to zero. If the amount of the NOL generated by a subsidiary that is absorbed exceeds the group member's basis in the stock of the subsidiary, the group member's basis in the stock is reduced below zero, creating a "negative basis." *Id.* This negative basis is called an "excess loss account" ("ELA"). The ELA provisions require that a parent's negative basis with respect to subsidiary stock be "recaptured" as taxable income when a triggering event, generally the parent disposing of stock in the subsidiary, occurs. ELA recapture is triggered, for example, when a parent ceases to own 80% of the shares of the subsidiary.

In sum, the ELA Treasury Regulations require that, if the stock of the subsidiary is sold to a non group member, any balance in the excess loss account is recognized as capital gain income. When the subsidiary ceases to be a member of the consolidated group, the amount of the ELA must be "recaptured" as income to the consolidated group.

If one of the members of a consolidated group has generated a NOL for the taxable year, that loss must be used in the group's federal income tax return to reduce the group's total taxable income and may not be used again. *See* Treasury Regulations §§ 1.1502–2; 1.1502–11; 1.1502–12; 1.1502–21A. Nothing in the IRC or the Treasury Regulations requires members of a consolidated group to compensate the group, the parent, or any other member for the incurrence of income or loss that may generate either tax liability or benefit for the group. Although neither the IRC or the Treasury Regulations mandate, mention, or refer to the use of tax sharing agreements, it is not uncommon for the members of a consolidated group to

provide for the allocation of the economic impact of these liabilities and benefits among themselves by entering into private agreements that prescribe whether and how payments shall be made within the consolidated group to take account of the income and losses of the members. *See* Bitker & Eustice, *Federal Income Taxation of Corporations and Shareholders,* at ¶ 13.41[4][b] (Warren, Gorham & Lamont 7th ed.2000). In this case, Marvel Entertainment and Mafco entered into such an agreement; that agreement forms the basis for all of the claims asserted by Marvel in this action.

## B. *The Tax Sharing Agreement*

On or about May 19, 1993, when Mafco increased its direct and indirect ownership of Marvel Entertainment to a level in excess of 80%, the Marvel Group became part of Mafco's consolidated tax filing group. Marvel and Mafco remained members of the same consolidated group until April 24, 1997, when Marvel Entertainment was "deconsolidated" from the Mafco consolidated group after a change in control of Marvel Entertainment's immediate parent company, Marvel Holdings, Inc.

While the parties were members of the same consolidated tax group, Marvel Entertainment and Mafco's responsibilities and obligations with regard to the consolidated group's federal income tax liability were governed solely by the IRC. Under the IRC, Mafco was primarily responsible to pay the consolidated tax liability of the entire consolidated tax group, including the Marvel Group's portion. Following the consolidation, in order to allocate the financial consequences of the federal income tax laws among the members of the consolidated group, Marvel Entertainment and Mafco entered into the Tax Sharing Agreement.

Under the Tax Sharing Agreement, the Marvel Group was to calculate its federal income tax liability each year while it was a member of Mafco Group as if it were a hypothetical stand-alone taxpayer rather than part of the Mafco consolidated group. If the Marvel Group stand-alone entity had positive taxable income in a given tax year, Marvel Entertainment would pay to one or more of the corporate defendants an amount equal to the tax that would be due on such income, whether or not the Mafco group actually had taxable income. Conversely, if Marvel Entertainment generated NOLs (again computed on the assumption that it was a stand-alone entity) that it could have carried back to offset its previously earned taxable income had it been filing its own income tax return, Mafco would pay to Marvel Entertainment an amount equal to the tax benefit that would have inured to Marvel Entertainment has it not been part of the Mafco consolidated tax group. Mafco was required to make such payments whether or not the Mafco consolidated tax group was otherwise liable for federal income tax, due to the fact that other members of the Mafco consolidated tax group had no taxable income or were generating NOLs. Thus, pursuant to the Tax Sharing Agreement, Marvel Entertainment was paid for the hypothetical tax benefit that arose from its stand-alone NOLs even when the other parties to the Tax Sharing Agreement would derive no benefit from them. Any portions of NOLs that remained after they were carried back against the Marvel Group's separate income in prior years on a stand-alone basis, could be carried forward for tax-sharing purposes and used to reduce the Marvel Group's future years' taxable income, and thus reduce or eliminate the Marvel Group's tax payment obligation to the defendants.

In effect, under the Tax Sharing Agreement, Mafco acted as a proxy for the IRS.

If Marvel Group as a stand-alone taxpayer would have owed taxes to the IRS, it made a tax-sharing payment to Mafco, but if Marvel Group as a stand-alone taxpayer would have received a refund from the IRS, Mafco made a tax-sharing payment to Marvel Group.

The Agreement did not have any provisions directly addressing the effects of deconsolidation of the Marvel Group from the Mafco consolidated tax group. It did, however, have a provision that addressed "any situation or circumstance concerning such calculation and allocation that is not specifically contemplated" by the Agreement. That provision, section 12, provided that such calculations and allocations should be "dealt with in a manner consistent with the underlying principles of calculation and allocation in the Agreement." The parties to the Agreement also provided that they would cooperate to provide each other with any necessary information, stating in paragraph 8(b) that:

> Parent, Marvel and Marvel III shall provide one another with such information concerning such returns and the application of payments made under this Agreement as Parent, Marvel or Marvel III may reasonably request of one another.

The Tax Sharing Agreement was publicly disclosed no later than March 31, 1994, when it was filed with the Securities and Exchange Commission as an exhibit to Marvel Entertainment's 1993 Form 10–K.

C. *The Marvel Group's 1995 and 1996 NOLs*

As a result of Marvel Entertainment's addition to the Mafco group as of May 19, 1993, Marvel Entertainment's three tax years preceding 1995 were (i) the January 1 to May 18, 1993 short tax year, when the Marvel was not a part of the Mafco group;

(ii) the May 19 to December 31, 1993 tax year, and (iii) the January 1 to December 1994 tax year. In 1993 and 1994, Marvel generated taxable income and, under the terms of the Tax Sharing Agreement, made payments to Mafco in the amounts of approximately $12.7 million in 1993 and $13.7 million in 1994.

In 1995, while Marvel Entertainment was still a member of the Mafco consolidated tax group, the Marvel Group generated an NOL for the first time in several years. Computed on a stand-alone basis, the amount of the Marvel Group's NOL in 1995 was $61.8 million. Pursuant to the IRC and Regulations, Marvel Entertainment carried a portion of its 1995 NOL back to its May 18, 1993 short tax year, to offset approximately $23 million in income that it had reported for that short tax year, and received the appropriate refund from the IRS. Under the Agreement, the remainder of the 1995 NOL was applied to offset Marvel Entertainment's income (computed on a stand-alone basis) for its short tax year ending December 31, 1993 and for its 1994 tax year. The Mafco group reimbursed the Marvel Group in the amount of approximately $15.1 million, in accordance with the Agreement, for such application of the Marvel Group's 1995 NOL.

Marvel Entertainment has not been profitable since before 1995. Thus, in 1996 and in the portion of 1997 during which it was part of Mafco's consolidated tax group, Marvel again generated stand-alone NOLs. Computed on a stand-alone basis, the amount of Marvel's 1996 NOL was $139.9 million. As required by the federal income tax laws governing consolidated tax groups, Marvel's 1996 NOL was, like its 1995 NOL, consolidated with income and losses generated by other members of the Mafco consolidated tax group in the con-

solidated tax returns for the group for those years.

Unlike its 1995 NOL, whose entire value could have been used to offset income earned by Marvel in prior tax years had it been filing as a stand-alone entity, only a portion of Marvel's 1996 stand-alone NOL, approximately $40.5 million, could have been used to offset income in this manner. Therefore, under the Agreement, in consideration of Marvel's hypothetical 1995 $61.8 million stand-alone NOL and the $40.5 million portion of its hypothetical 1996 stand-alone NOL, Marvel Entertainment was ultimately paid in full by Mafco under the Tax Sharing Agreement for its hypothetical tax refund, approximately $25 million—$15.1 million for the 1995 NOL and $10.4 million for the 1996 NOL—by virtue of carrying back those NOLs on a stand-alone basis. Approximately $100 million of Marvel Entertainment's 1996 NOL, however, could not be carried back to any prior Marvel Group tax year. Accordingly, under the terms of the Agreement, Mafco did not reimburse Marvel for this portion of the 1996 NOL that could not be applied to offset Marvel's stand-alone income for prior tax years. Because the Mafco consolidated tax group used the 1996 Marvel NOL in its consolidated federal income return, as it was required to by the tax code, Marvel is prohibited by the IRC and Regulations from using that NOL in its own tax returns in the future.

D. *Marvel Entertainment's Deconsolidation from the Mafco Group*

On December 27, 1996, Marvel Entertainment and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. During 1997, both Marvel Entertainment and Chase Manhattan Bank, as agent for the debtor-in-possession (the "DIP Agent") lenders, made demands on Mafco for pay-

ment of $10.4 million then owned to Marvel Entertainment under the Tax Sharing Agreement for the portion of Marvel's 1996 NOL that could have been used to offset income earned by it in prior years.

Thereafter, as part of a settlement concerning the use of the lenders' cash collateral, Marvel Entertainment agreed that Mafco would make the post-petition payment due under the Agreement directly to the DIP Agent, which would release $4.2 million of the funds to Marvel Entertainment for working capital, credit another $2.5 million to interest owed by Marvel Entertainment under its DIP financing agreement, and hold the balance as cash collateral for Marvel Entertainment's obligations under the DIP financing agreement. The Bankruptcy Court approved and memorialized this agreement in a Stipulation and Order With Respect to the Limited Use of Cash Collateral dated October 21, 1997.

In connection with obtaining court approval of the Stipulation and Order, Marvel Entertainment also gave a release and indemnity to Mafco and the director defendants in a Release Agreement dated October 27, 1997. In the Release Agreement, Marvel Entertainment "acknowledges that the payment to Chase Manhattan Bank" pursuant to the Stipulation and Order "satisfies all remaining obligations of Mafco to make refunds to Marvel or to the Marvel Group under Section 5(b) of the Tax Sharing Agreement" and thus releases Mafco and its officers, directors, and employees from "claims related to or arising out of the Tax Sharing Agreement for payment due to [Marvel] under Section 5(b) of the Tax Sharing Agreement." Section 5(b) of the Tax Sharing Agreement provides:

> *Refund of Tax Sharing Payment:* In the event that the calculation of the Marvel Group's Federal Taxable Income ... for any Taxable Period results in a loss, such loss may be carried back and deducted in calculating the Marvel Group's Federal Tax ... for prior Taxable Periods in the same manner as it would have been carried back and deducted has it constituted a net operating loss deduction under [certain sections of the IRC]

The scope and effect of this release is disputed by the parties.

### E. *Marvel Entertainment's April 24, 1997 NOL*

On or about April 24, 1997, Marvel Entertainment was deconsolidated from the Mafco tax sharing group when a third party obtained voting control of Marvel Entertainment. As a result, Marvel had a short tax year from January 1 to April 24, 1997 and another short tax year from April 25 to December 31, 1997. Because Marvel was again not profitable during the portion of 1997 for which it was part of Mafco's consolidated tax group, Marvel again generated a stand-alone NOL. Computed on a stand-alone basis, the Marvel Group had a NOL of approximately $66 million for its short tax year ending April 24, 1997.

Upon deconsolidation, the Marvel Group was allocated $18.8 million of NOLs generated by it during the period in which the Marvel Group was consolidated with the Mafco Group, in accordance the IRC and applicable regulations. This left the Mafco group a $47.2 million stand-alone NOL that had been generated by Marvel during the short-year 1997 tax year. As required by the federal income tax laws, as with Marvel's stand-alone 1995 and 1996 NOLs, Marvel's short-year 1997 stand-alone NOL was consolidated with income and losses generated by other members of the Mafco consolidated tax group in the consolidated tax returns for the group. Marvel Entertainment's 1997 NOL, however, could not

be carried back to any prior Marvel Group tax year. Accordingly, under the Tax Sharing Agreement, Mafco did not reimburse Marvel for its 1997 NOL. Because the Mafco consolidated tax group used the 1997 Marvel NOL in its consolidated federal income return, as it was required to do so, Marvel is prohibited by the IRC and Regulations from using that NOL in its own tax returns in the future.

Due to the deconsolidation of the Marvel Group from the Mafco group, the ELAs of the Mafco group relating to the Marvel Group were triggered and, as a result, the Mafco group had to recognize $150.6 million in taxable income. Thus, in accordance with IRS regulations, upon the deconsolidation of Marvel from the Mafco consolidated tax group, Mafco was required to give up any tax benefit that it may have gained from the Marvel's NOLs through the income tax adjustments that arose from the triggering of the ELAs. Because the Mafco group had an inventory of several billion dollars of consolidated NOLs from its other members, the recognition of such income did not result in any actual tax liability for the Mafco group, but it did result in $150.6 million of NOLs being used to offset such income.

### F. *The Continuing Losses of Marvel Entertainment*

On July 31, 1998, this court entered a consent order confirming the Fourth Amended Joint Plan of Reorganization Proposed By the Secured Lenders and Toy Biz, Inc. Under the Joint Plan, Marvel Entertainment was to be merged into a holding company controlled by Toy Biz. On October 1, 1998, Toy Biz and the secured lenders consummated the plan, and Toy Biz changed its name to Marvel Enterprises, Inc.

Since leaving the Mafco consolidated tax group in April 1, 1997, Marvel Entertainment has not had any operating profits, nor has the Marvel Enterprises consolidated tax group of which Marvel Entertainment became a member in October 1998. For the tax period from April 25 to December 31, 1997, the Marvel Group generated NOLs in the amount of $87.4 million. For the tax period from January 1 to October 1, 1998, the Marvel Group generated NOLs in the amount of $80.9 million. For the tax period from January 1, 1998 to December 31, 1998, the Marvel Enterprises consolidated tax group generated NOLs in the amount of $43.1 million. For the tax period from January 1, 1999 to December 31, 1999, the Marvel Enterprises consolidated tax group generated taxable income in the amount of $797,679.[2]

Each of Marvel Enterprises' 1999 and 2000 Form 10–K filed with the Securities and Exchange Commission states that "[n]o benefit was provided for ... the Federal ... net operating loss carryforwards" at the end of that year. This statement means that the independent auditors of Marvel Enterprises believed that for the purposes of GAAP, it was more likely than not that the current NOLs of

---

2. Despite this factual recitation in the pretrial order, the parties appear to dispute whether the overall Marvel Enterprises family of corporations (including foreign subsidiaries, whose results may not be included in a U.S. consolidated federal income tax return) had positive operating results in 1999 and in the first quarter of 2001. Mafco contends in its briefing that since leaving the Mafco consolidated group in April 1997, Marvel Enter- tainment has not had any operating profits, nor has the Marvel Enterprises consolidated tax group of which Marvel Entertainment became a member in October 1998. Mafco notes that Marvel Enterprises generated $17 million of NOLs in 1999 and, in a February 27, 2001 press release, reported a net loss of $89.9 million for the year ended December 31, 2000.

the Marvel Enterprises' group, including the Marvel Group, would not be realized because the group will not have any taxable income to offset with those NOLs before they expire.

### G. Marvel's Lawsuit Against Mafco

The Marvel Group, in this lawsuit, alleges that while it was part of the Mafco consolidated tax group from May 19, 1993 through April 24, 1997, it generated approximately $147 million in NOLs, which were used on Mafco's 1996 and 1997 federal tax returns, for which it was not fairly compensated. The $147 million in NOLs for which Marvel asserts it was not fairly compensated is comprised of a $100 million portion of its 1996 NOL and its entire $47 million short tax year 1997 NOL. Marvel asserts that it should be compensated for Mafco's use of these NOLs, because once they were used by Mafco in its federal tax returns, they can no longer be used by Marvel Entertainment or its successor, Marvel Enterprises.

Marvel raises three legal theories that it believes entitles them to the relief they seek. First, the Marvel Group raises a breach of fiduciary duty claim contending that Mafco's failure to compensate Marvel for the use of its NOLs in 1996 and 1997 under the Tax Sharing Agreement constitutes an act of "gross and palpable overreaching" in a parent-subsidiary relationship. Marvel also asserts a claim for breach of contract under paragraphs 12 and 8(b) of the Tax Sharing Agreement. Last, Marvel contends that Mafco's use of Marvel's NOLs constitutes a non-ordinary course transfer of Marvel's property that is avoidable under the Bankruptcy Code.

### ii. DISCUSSION

The parties have stipulated to the facts as set forth by the court above. To resolve the disputed liability issues, the court has considered the arguments made both at oral argument and in parties' briefing accompanying Mafco's summary judgment motion and Marvel's motion to dismiss Mafco's counterclaims, as well as the supplemental briefing that has been submitted by the parties.

### A. Are Marvel's Claims Barred by the Release Agreement?

■ Before reaching at the merits of the parties dispute, the court must first consider Mafco's contention that Marvel Entertainment released Mafco from all of the claims it now brings in this action in its October 1997 Release Agreement. According to Mafco, the terms of the release indicate that as quid pro quo for obtaining the benefit of the $10.4 million payment, Marvel Entertainment agreed to "release, acquit, and forever discharge" Mafco from any and all claims "related to or arising out of the Tax Sharing Agreement for payment due to [Marvel] under Section 5(b) of the Tax Sharing Agreement," and that this release shall be "a complete defense and bar to any action, claim, or demand" brought on such claims for payment. Mafco asserts that since section 5(b) is the only section of the Tax Sharing Agreement that addresses NOLs generated by Marvel Entertainment and its right to be compensated on account of them, the release acts to bar the claims raised in Marvel's complaint. Thus, Mafco concludes, because the Marvel's breach of contract claims "directly aris[e] out of the Tax Sharing Agreement" and the other claims—including those for breach of fiduciary duty for causing Marvel Entertainment to enter into the contract and to avoid alleged transfers of NOLs pursuant to the contract—are "related to" the Tax Sharing Agreement, these claims have been released and should be dismissed.

According to Marvel, it never released Mafco from the claims brought in this litigation. Marvel contends that because the release is limited to claims arising out of section 5(b), it does not act to bar its claims, which are based on other sections of the Tax Sharing Agreement or on fiduciary duties, which Marvel argues the director defendants breached by causing Marvel to enter the Agreement.

Section 5(b) of the Agreement deals specifically with reimbursement to the Marvel Group of past tax sharing payments as a result of the Marvel Group's ability to carry back, on a hypothetical stand-alone basis, losses to years in which it made such payments. This release accompanied the settlement of the dispute between the DIP Agent and Marvel Entertainment as to which of them was entitled to receive the $10.4 million owed by Mafco to Marvel pursuant to section 5(b) of the Tax Sharing Agreement in consideration for Marvel's 1996 NOL.

 The release was not, as Mafco asserts, the quid pro quo for getting the $10.4 million payment; the parties did not dispute the fact that the money $10.4 million payment for its 1996 NOL was owed by Mafco under the Tax Sharing Agreement. The only dispute was as to which party—the DIP Agent or Marvel—should receive the payment. "In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document." *Adams v. Jankouskas*, 452 A.2d 148, 155 (Del.1982). In view of the circumstances surrounding the release and the language in the release stating that it released claims relating to or arising from section 5(b) of the Tax Sharing Agreement, the intent of the release was to prevent Marvel from asserting that it was owed more than what it got for past payments under the terms of the agreement and to prevent Mafco from being liable to Marvel for such past payments once it had satisfied its obligation by paying the money to the DIP Agent. Had Marvel asserted a claim against Mafco in this lawsuit that Mafco still owed it money under the Agreement in consideration of its use of the one of the past year's NOLs, the release would bar Marvel's claim because that claim would necessarily arise out of section 5(b) of the Tax Sharing Agreement.

In this litigation, however, Marvel does not dispute the correctness of Mafco's past payments for NOLs under the Agreement. Rather, Marvel claims that Mafco's refusal to compensate the Marvel Group for the lost future benefit of its NOLs after deconsolidation is either a breach of section 12 of the Tax Sharing Agreement, that causing Marvel to enter into the Tax Sharing Agreement itself was a breach of fiduciary duty, or that Mafco's use of Marvel's NOLs without fair compensation constitutes an avoidable transfer under the Bankruptcy Code. These claims do not arise out of or relate to section 5(b) of the Agreement, as required by the language of the release. While these claims are surely related to the Tax Sharing Agreement, the scope of the release does not cover all claims arising out of or relating to the Tax Sharing Agreement. Instead the release only covers those claims arising out of or relating to section 5(b) of the Agreement. Accordingly, because the court finds that Marvel is proceeding under legal theories that are not grounded in section 5(b) of the Tax Sharing Agreement, Marvel's claims are not barred by the release.[3]

---

3. Mafco argues, in part, that at least Marvel's section 12 breach of contract claim should be barred because section 5 is the only section in the Agreement that addresses compensation

B. *Are the Director Defendants Liable for Breach of Fiduciary Duty?*

1. *Is the Breach of Fiduciary Duty Claim Time–Barred?*

Before turning to the merits of the Marvel Group's breach of fiduciary duty claim, the court must first address Mafco's defense that the claim is barred by the applicable statute of limitation. Mafco claims that the Marvel Group's breach of fiduciary duty claim is time-barred because the applicable three year statute of limitations, *see* 10 Del.C. § 8106, which it asserts began to run when the Tax Sharing Agreement was executed on May 19, 1993, expired before this action was commenced on December 28, 1998. *See Kahn v. Seaboard Corp.*, 625 A.2d 269, 274 (Del.Ch. 1993) (applying three year limitations period to breach of fiduciary duty claim premised on unfair contract between parties); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F.Supp. 372, 379 (D.Del.1983) (applying 10 Del.C. § 8106 to fiduciary duty claim). Mafco asserts that where, as here, the claimed breach is premised on an allegedly unfair contract, the limitations period begins to run when the contract is formed. *See Kahn*, 625 A.2d at 270–71. Mafco also contends that the limitations period should not be tolled until April 24, 1997, when Mafco lost "control" of Marvel, because although Marvel itself was powerless to bring a lawsuit against Mafco by virtue of the director defendants' domination of its board, Marvel's stockholders had the power to challenge the Tax Sharing Agreement at any time through a derivative suit on the corporation's behalf. *See Levine v.*

*Smith*, 591 A.2d 194, 200 (Del.1991), *overruled in part on other grounds by, Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

Marvel, in response, acknowledges that the breach of fiduciary duty claim is subject to the three year limitations period set forth in 10 Del.C. § 8106, but argues that the limitations period did not begin to run until September 15, 1997, the extended due date for corporations to file their 1996 tax returns. Marvel argues that this was when Mafco first engaged in the alleged wrongful conduct that caused injury to the plaintiff by using the Marvel NOLs in its consolidated tax return for the 1996 tax year without compensating Marvel for such use. Alternatively, Marvel contends that even if the wrongful conduct were deemed to have occurred before September 15, 1997, the statute of limitations was tolled until April 24, 1997, because until that date, the plaintiffs were dominated and controlled by the defendants and were thus unable to file an action against them. *See* 3A James Solheim & Kenneth Elkins, Fletcher Encyclopedia of the Law of Private Corporations § 1306.20 (1994 & Supp. 1998) (under the theory of "adverse domination," the statute of limitations is tolled for as long as a corporate plaintiff continues under the domination of the alleged wrongdoers).

This action was commenced on December 28, 1998. There is no disagreement between the parties that Delaware's three year statute of limitations, 10 Del.C. § 8106, applies to the fiduciary duty claim. *See Fike v. Ruger*, 754 A.2d 254, 260 (Del.

---

for NOLs. Mafco claims that while Marvel is facially proceeding under the section 12 "catch-all" provision, the breach of contract claim is in truth a disguised claim under section 5 because section 12 states only that all allocations must be "dealt with in a manner consistent with underlying principles of calculation and allocation in the Agreement."

While the court acknowledges that this argument carries some force, the court is hesitant to collapse Marvel's section 12 breach claim into a section 5 breach claim based on Marvel's contention that section 12 set forth additional rights exclusive of section 5. Therefore, the court will evaluate the breach of contract claim on the merits.

Ch.1999). The disputed issues with respect to whether the action was timely filed are (i) when the statute of limitations period began to run, and (ii) whether the limitations period should be tolled due to the defendants' adverse domination of the plaintiff's board of directors.

### a. *When did limitations period begin to run?*

■ In addressing whether an action is time-barred, the court must first determine the time when the cause of action accrued. The court agrees with Mafco that because the fiduciary duty claim is based on the adoption of the terms and conditions set forth in the Tax Sharing Agreement dated May 19, 1993, that, under Delaware case law, Marvel's fiduciary duty claim accrued on the date of the adoption of that contract. More specifically, because this claim is premised on Mafco and the director defendants having caused Marvel Entertainment to enter into the Tax Sharing Agreement, the elements of this claim—a duty, and an alleged breach—were established no later than May 19, 1993, when Marvel Entertainment entered into the Tax Sharing Agreement.

Delaware law supports finding that where the claimed breach of fiduciary duty is an allegedly unfair contract, the limitations period begins to run when the contract is formed. For example in *Kahn v. Seaboard Corp.*, 625 A.2d at 274, on a similar set of allegations that a majority shareholder forced the corporation they controlled into a detrimental long-term contract in breach of fiduciary duties, the Delaware Court of Chancery held that the three year limitations period barred the claim, noting that:

> [t]he wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirect-

ly, to defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract . . . Complete and adequate relief, if justified, could be shaped immediately or at any point thereafter.

*Kahn*, 625 A.2d at 271. Similarly, in *Schreiber v. Bryan*, 396 A.2d 512, 516 (Del. Ch.1978), a case involving a derivative claim of waste based on a tax sharing agreement, the Chancery Court, in concluding that the shareholder plaintiff who had purchased stock after the transaction had occurred did not have standing, stated that "what must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *Id.* Here, as in those cases, the alleged wrongful acts were consummated at the time the tax sharing agreement at issue was entered into.

Marvel seeks to distinguish the present case from *Kahn*, arguing that here the wrongful conduct was not the execution of the Agreement, but rather Mafco's performance under the Agreement. Marvel submits that because Marvel generated no hypothetical stand-alone NOLs in 1993 and 1994 and was reimbursed in full by Mafco for its 1995 hypothetical stand-alone NOL, Mafco did not treat Marvel unfairly by using its NOLs without fair compensation until Mafco filed its 1996 tax return. Thus, Marvel argues that its fiduciary duty claim first accrued on September 15, 1997 (the date on which Mafco filed it 1996 tax return), even though the alleged injury to Marvel is based on the terms and conditions previously established by the Agreement entered into by the parties in 1993. This same argument was considered and rejected by the Chancery Court in *Kahn*, when Chancellor Allen stated:

It is implicitly admitted that payments were made by Seaboard as provided in the contract .... the payments it calls for are legal obligations, not wrongs. Thus, unlike a continuing wrong, the only liability matter to be litigated involves defendants' 1986 actions in authorizing the creation of these contract rights and liabilities.

*Kahn,* 625 A.2d at 271.

■ Here, as in *Kahn,* the plaintiffs' breach of fiduciary duty claim hinges upon the allegations that the terms and conditions established by a contract are unfair to the plaintiff corporation. Accordingly, the court finds that here, as in *Kahn,* the cause of action accrued when the contract fixed the parties' rights (in 1993) and not when an allegedly harmful legal obligation arose under the contract (in 1997). This finding is consonant with the principle that in discerning when a cause of action accrues, "the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt." Ernest L. Folk, III, *et al.,* Folk on Delaware General Corporation Law § 327.3 (4th ed.).[4]

b. *Is there a basis to equitably toll the limitations period?*

■ Having found that the plaintiffs' fiduciary duty claim accrued on May 19, 1993, when the director defendants caused Marvel to enter into the Tax Sharing Agreement, the court must next determine whether the statute of limitations should nonetheless be tolled until April 24, 1997 under the doctrine of "adverse domination," because until that date the plaintiffs were dominated and controlled by the defendants and were unable to file an action against them. If the court were to find such tolling appropriate, because this action was initiated within three years of the date when the defendant directors ceased to control Marvel's board, it would not be time-barred. Absent tolling, however, the action would be time-barred because the suit was filed well after the three year limitations period ended on May 19, 1996.

■ Under the adverse domination doctrine, the statute of limitations on a corporation's claim against its officers and/or directors is equitably tolled while the corporation's board of directors is controlled by culpable directors. The premise underlying the adverse domination doctrine is that a corporation acts through its board of directors, and when that board of directors is controlled by culpable directors it will not cause the corporation to bring a lawsuit against themselves. *See Federal Deposit Ins. Corp. v. Bird,* 516 F.Supp. 647, 652 (D.P.R.1981); *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 635 A.2d 394, 402 (1994). Since the advent of this doctrine in the *Bird* case, there have been a multitude of cases in many jurisdictions accepting various versions of the adverse domination tolling doctrine. *See Hecht,* 635 A.2d at 401–02 (collecting cases). Delaware courts, however, have neither accepted nor rejected the use of the adverse domination doctrine, and, as far as the court can discern, the issue has not been addressed by a Delaware court.

In those jurisdictions where the doctrine has been accepted, the adverse domination

---

4. Moreover, Mafco correctly points out that if the court agreed with Marvel that the fiduciary duty claim accrued, not in May 1993, but in September 1997, that would lead to the absurdity of allowing a fiduciary duty claim to proceed against persons who were not fiduciaries when the claim accrued. This is so because according to the complaint, the time period during which the defendants allegedly owed fiduciary duties ended on April 24, 1997, five months prior to the date that Marvel asserts should be the accrual date of the fiduciary duty claim. *See* Sec.Am.Compl. ¶ 106.

doctrine has generally been applied to a specific type of case. As the Supreme Court of Kansas noted, in reviewing the history of the doctrine:

> [m]ost reported cases referring to the doctrine were decided in the 1980's or 1990's and involve failed banks or savings and loans. Plaintiffs in the action wherein the doctrine is referred to are most likely to be the FDIC, FDSLIC, or RTC [because] [g]iven the customarily short statute of limitations ... the statute would run before the action could be brought be the federal agency unless some special doctrine or exception exists which tolls the statute.... Adverse domination has been recognized in many jurisdictions as the vehicle to overcome a statute of limitations defense in such situations.

*Resolution Trust Corp. v. Scaletty*, 257 Kan. 348, 891 P.2d 1110, 1114 (1995).

 While the doctrine has not been expressly limited to application in receivership cases, its use in those types of cases is relevant because it illuminates the rationale behind the theory. The District of Puerto Rico in *Bird* recognized that the touchstone of the adverse domination theory lies in ensuring that claims are not barred before the underlying wrongs are disclosed to those who can represent the corporation in a suit against the directors, when it stated that its holding was based on "the realities of the shareholders' position, that, without knowledge of wrongful activities committed by directors, shareholders have no meaningful opportunity to bring suit." 516 F.Supp. at 651. Subsequent cases addressing the doctrine have similarly recognized that the statute of limitations is allowed to run once someone

has sufficient knowledge and ability to seek redress on the corporation's behalf. *See Federal Deposit Ins. Co. v. Hudson,* 673 F.Supp. 1039, 1042 (D.Kan.1987) (stating that "other federal district courts have followed the lead of ... *Bird* ..., recognizing that '[t]he emphasis has shifted from a right of shareholders to inspect corporate records and affairs to a duty of corporate managers to disclose' "); *Scaletty,* 891 P.2d at 1116 (adverse domination will be determined by when injurious facts are readily ascertainable by corporation); *Hecht,* 635 A.2d at 406 (presumption of tolling "can be rebutted ... by evidence that someone other than the wrongdoing directors had knowledge of the cause of action, and both the ability and the motivation to bring suit")[5]. Moreover, some courts have adopted a version of the doctrine under which "the plaintiff has the burden of showing 'full, complete, and exclusive control' by culpable directors charged with wrongdoing and must negate the possibility that an informed director or shareholder could have induced the corporation to institute suit." *Hecht,* 635 A.2d at 403 (citing *Farmers & Merchants Nat. Bank v. Bryan,* 902 F.2d 1520 (10th Cir. 1990) and *Resolution Trust Corp. v. Fleischer,* 826 F.Supp. 1273, 1278 (D.Kan. 1993)); *cf. Clark v. Milam,* 452 S.E.2d 714 (W.Va.1994) (holding that doctrine of adverse domination tolls statutes of limitation notwithstanding that claims similar to plaintiff's claims could have been raised by shareholders of company, where shareholders of the parent company had little interest in redressing the wrongs to the subsidiary insurance company).

Marvel cites no Delaware authority on point in support of its request to toll the

---

5. Significantly, before adopting the adverse domination doctrine and allowing the corporation to proceed with its suit, the *Hecht* court noted that (unlike Delaware) as a general rule in Maryland, shareholders are barred from bringing actions on behalf of the corporation. *Hecht,* 635 A.2d at 398 (citing *Davis v. Gemmell,* 70 Md. 356, 376, 17 A. 259 (1889)).

statute of limitations based on the defendants "adverse domination" of the plaintiff's board. Nor can the court find any Delaware case that recognizes the adverse domination doctrine as a tolling mechanism. Moreover, the cited cases from foreign jurisdictions are unhelpful in resolving whether the adverse domination theory should be available to toll the statute of limitations in cases such as this one, where, although the director defendants dominated the plaintiff's board, the alleged harmful act (i.e. the entering of the Tax Sharing Agreement) was disclosed to plaintiff's shareholders who could have instituted derivative actions on behalf of the corporation. *See, e.g., In re Mi–Lor Corp. v. Gottsegen, et al.,* 233 B.R. 608 (Bankr. D.Mass.1999) (basing decision that tolling is appropriate partially on the fact that the plaintiffs' did not and could not have reasonably learned of the misdeeds until after the defendants ceased to be a board majority).

■ However, certain courts that recognize the adverse domination theory of tolling have stated that "if ... shareholders learn of the misconduct that harms their corporation, the [adverse domination] rule may no longer toll the limitations period." *Clark,* 452 S.E.2d at 720. In the absence of authority in Delaware to the contrary, the court finds that when disclosures of the alleged harmful acts are made to shareholders, the corporate entity is no longer without redress against those who control it because the shareholders have both the knowledge and authority to protect the corporation's rights, and that therefore, there is no reason to toll the statute of limitations. *See Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984) ("The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it."); *see also Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789 (Del.Ch. 1967) (derivative action challenging tax sharing agreement).

The tolling doctrines that have been recognized in Delaware provide support for the above stated proposition that, where representatives of the corporation have both notice and opportunity to redress the alleged wrongs against the corporate entity, tolling is inappropriate. For example, courts have consistently rejected "equitable tolling" of limitations periods where the facts underlying the claims were disclosed in publicly filed documents. *See, e.g., In re Dean Witter P'ship Litig.,* C.A. No. 14816, 1998 WL 442456, at *8 (Del.Ch. July 17, 1998) (refusing to toll limitations period because information in defendants' annual reports should have provided the plaintiffs with adequate notice of their claims), *aff'd mem.,* 725 A.2d 441, 1999 WL 87385 (Del.1999); *Seidel v. Lee,* 954 F.Supp. 810, 817 (D.Del.1996); *United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys. Inc.,* 677 A.2d 497, 503–04 (Del.1996) (refusing to toll statute of limitations because public documents could have put plaintiff on notice of any alleged misconduct by defendants); *In re USA-Cafes, L.P. Litig.,* C.A. No. 11146, 1993 WL 18769, at *5 (Del.Ch. Jan. 21, 1993) (refusing to toll statute of limitations to allow plaintiff to amend by adding time-barred claims, because public filings had put plaintiffs on notice that their rights had been infringed.).

Marvel contends that these cases are inapposite because they address whether the plaintiffs were on notice that their rights were violated and do not address what would happen if those claims belonged to corporations that were adversely dominated. The court disagrees. While Delaware courts that have addressed tolling have not directly focused on adverse

domination, per se, they have instead focused on the assumption that underlies the adverse domination doctrine—that "with control comes non-disclosure and without knowledge of directors' wrongful activities plaintiffs have no meaningful opportunity to bring suit." *Hecht*, 635 A.2d at 401. Therefore, in determining whether to toll a statute of limitations, Delaware courts inquire as to whether the facts underlying the plaintiffs allegations were publicly disclosed such that derivative suits could have been filed. As the *Dean Witter* court stated in describing equitable tolling as it exists in Delaware:

> [u]nderlying the doctrine is the idea that 'even an attentive and diligent [investor] relying . . . upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [Partnership].' This doctrine tolls the limitations period *until an investor knew or had reason to know of facts constituting the wrong* . . . . Significantly, if the limitations period is tolled under any of these theories [inherently unknowable injuries, equitable tolling, or fraudulent concealment], it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. Thus, the limitations begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice.

*Dean Witter*, 1998 WL 442456, at *6 (emphasis added); *see also Kahn*, 625 A.2d at 276–77 (where wrongful self-dealing is alleged in a derivative action, the statute does not run against the plaintiff until he or she knew or had reason to know the facts alleged to give rise to the wrong).

Because the court believes that Delaware's tolling mechanisms, in combination with the availability of shareholder derivative actions, already address the concerns that underlie the adverse domination doctrine, the court declines to recognize adverse domination as a viable tolling mechanism in Delaware. Moreover, even if the court were to accept that the adverse domination doctrine could be applied in Delaware, the court would decline to do so upon these facts, because the fiduciaries disclosed the tax sharing agreement at issue here in its 1993 Form 10–K.

### c. Would Marvel's breach of fiduciary duty claim have been successful on the merits?

■ To Marvel, it might seem eminently unsatisfactory for the court to find that its claim was barred by the statute of limitations due to the failure of its minority shareholders to institute a derivative suit in a timely manner, especially in consideration of equitable estoppel principles that have, in certain cases, been applied to prevent a fiduciary from using the statute of limitations to prevent claims of misconduct raised against it. *See, e.g., Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F.Supp. 1302, 1310 (S.D.N.Y.1989); *cf. Adams*, 452 A.2d at 157 (stating that "[w]hile the limitations of actions applicable in a court of law are not controlling in equity, absent unusual circumstances, the analogous statute of limitations will be given great weight in deciding whether the plaintiff's claim is barred by laches."); *but see United States Cellular*, 677 A.2d at 502 ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."). However, based upon the court's consideration of the parties' briefs on the merits of the fiduciary duty claim, the court notes here that even if it were to conclude, based on some equitable consideration, *see Kahn*, 625 A.2d at 272–76 (recounting equitable considerations relied on by the Chancery Court in the past to prevent statutes of limitation from bar-

ring fiduciary claims), that Marvel's claims were timely brought, the court would nonetheless agree with Mafco and find that the Tax Sharing Agreement is not unfair as a matter of law. Thus, while the court need not reach the merits of the fiduciary duty claim, in order to demonstrate that there are also substantive grounds for ruling in favor of Mafco on this claim, the court will briefly set forth its reasons in the following paragraphs.

On the merits, the parties dispute whether the decision to allocate tax liabilities according to the terms of the Tax Sharing Agreement constituted "gross and palpable overreaching," such that Mafco and the director defendants breached a fiduciary duty that was owed to Mafco's subsidiary, Marvel. Marvel claims that it is entitled to compensation for the value of the NOLs that were available to Mafco as a result of Marvel's membership in Mafco's consolidated tax group. Underlying the parties' dispute is a disagreement about the proper standard to be applied to directors in a parent-subsidiary tax sharing arrangement. While the Chancery court has stated that the standard to be applied to such agreements is "one of business judgment with which the court should not interfere absent a showing of 'gross and palpable overreaching,'" *Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789, 794 (Del.Ch.1967), the parties dispute whether this standard is one of business judgment or whether a more exacting "entire fairness" inquiry is called for.

■ In cases like this, the standard to be applied is often outcome determinative. *See Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1371 (Del.1995) (stating that "[b]ecause the effect of a proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of review fre-

quently is determinative of the outcome of litigation."). Under the standard of entire fairness, the burden is on the parent corporation to prove, subject to exacting scrutiny, that its transactions with the subsidiary were objectively fair. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 719–20 (Del.1971). Conversely, "under the business judgment rule ... a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching." *Id.* Thus, under the business judgment rule, a board's "decisions will not be disturbed if they can be attributed to any rational purpose" and a court "will not substitute its own notions of what is or is not sound business judgment." *Id.*

■ The question of which standard to apply in parent/subsidiary tax sharing situations was settled in *Meyerson* and confirmed again in *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72 (Del.1969). In *Meyerson*, the plaintiff, a minority stockholder of an 80% owned subsidiary, asserted that the parent corporation, which controlled the subsidiary through ownership, had breached its fiduciary duties by including the subsidiary in its consolidated tax group without implementing a "fair" tax sharing agreement. 246 A.2d at 790. There the plaintiff alleged that the inclusion of the NOLs generated by the subsidiary in calculating the tax liability of the consolidated group was unfair because the parent received tax benefits and did not share *any* of those benefits with the subsidiary. The relief sought by the plaintiff included payment for the NOLs generated by the subsidiary and a "fair allocation" of future benefits. The court granted summary judgment to the parent corporation, holding that the question of how much tax benefit is to be allocated between the parent and subsidiary in a tax sharing agreement is "one of business judgment...."

*Id.* at 794. This holding was later expressly approved of by the Delaware Supreme Court in *Wolfensohn,* 253 A.2d at 76. *See also Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883, 888 (Del.1970) (applying business judgment rule to parent-subsidiary allocation agreement and finding that subsidiary failed to demonstrate "gross and palpable overreaching.").

Marvel seeks to conflate the "gross and palpable overreaching" standard with that of entire fairness, arguing that this standard is not identical with the unexacting business judgment rule. In light of *Meyerson* and *Wolfensohn,* the court disagrees, and finds that the business judgment rule is the correct standard to be applied. Marvel's efforts to distinguish those cases are unpersuasive. The application of an entire fairness test that requires tax sharing agreements to be dollar-for-dollar fair to the parent and subsidiary would both be undesirable and unworkable. First it is better to leave such issues to the discretion of directors under the business judgment rule because "it is impossible, as between parent and subsidiary, to set fair standards for allocation agreements." *Meyerson,* 246 A.2d at 794; *see also* Mary Siegel, The Erosion of the Law of Controlling Shareholders, 24 Del.J.Corp.L. 27, 37 n. 39 (1999) (internal citations omitted) ("Courts treat decisions to file a consolidated tax return, which is available to a parent owning at least 80% of the shares of its subsidiary, under the deferential business judgment rule ... primarily due to the fact that there is no marketplace counterpart by which to measure the fairness of these transactions."). Second, an entire fairness inquiry would make little sense because the consequences of tax consolidation are not dictated by the parent corporation, but by the IRS. Here, Marvel's hypothetical stand-alone NOLs were required to be included in the determination of the taxable income of the Mafco consolidated tax group.

Applying the business judgment rule to the transaction at issue, the court would thus find that causing Marvel to enter the Tax Sharing Agreement was not a breach of fiduciary duty. Absent the tax sharing agreement, Mafco would have had to pay Marvel's portion of the Mafco consolidated group's federal income tax liability if, in the same year, the other members of the Mafco group had also generated income. The court agrees with Mafco that the Agreement served the rational purpose of raising funds for the payment of the Mafco group's consolidated tax liabilities from those members of the group, including Marvel, which generated the income that gave rise to those liabilities. *See Brehm v. Eisner,* 746 A.2d 244, 264 (Del.2000) (in applying the business judgment rule, the court will not measure, weigh, or quantify directors' judgments unless they are found to be wholly irrational).

Moreover, even if the court were to apply the "gross and palpable overreaching" standard in a manner that is more exacting than the standard of "waste" or the "business judgment rule," and were to analyze this transaction from the perspective that "[s]elf-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority shareholders of the subsidiary," *Sinclair Oil,* 280 A.2d at 720, the court would nonetheless come to the same conclusion. It is undisputed that Mafco enjoyed no unfair tax benefits from the Tax Sharing Agreement as a result of Marvel's deconsolidation because the tax laws, which Mafco complied with, require the adjustment of any Marvel NOLs that were used.

Any alleged incidental non-tax benefits[6] that accrued to Mafco as a result of the agreement are not egregious enough to merit a finding that this transaction constituted "gross and palpable overreaching." The two non-tax benefits cited by Marvel pertain to benefits to Mafco arising merely from the use of money that Marvel paid to it under the Agreement. Such benefits are not unfair because in other years, under the terms of the Agreement, Mafco paid out substantial monies to Marvel. From Marvel's perspective, therefore, the Tax Sharing Agreement eased the impact of the tax laws on Marvel, because absent such an agreement, under the tax laws it could not receive any refunds with respect to taxes paid during the period it was a member of the Mafco consolidated group, even had it been entitled to such refunds as a stand-alone taxpayer. Under the Agreement, however, Marvel received millions of dollars from Mafco on account of the NOLs it generated. Had Marvel been a stand-alone taxpayer, it would have had to pay the same amount that it paid to Mafco to the IRS and would have received the same refunds that Mafco paid to it from the IRS.

Because under the terms of the Tax Sharing Agreement, Mafco essentially acted as a proxy for the IRS, Marvel cannot be said to be harmed by paying to Mafco monies that it would have had to pay to the IRS had it not been a member of the Mafco consolidated group. The injury that Marvel complains of, however,—its loss of the use of its future NOLs—resulted from the operation of the IRC and applicable Treasury Regulations and not from any wrong committed by the defen-

dants. Accordingly, the court would not substitute its judgment for the judgment of the director defendants regarding the proper allocation of taxes in a consolidated tax group.

## C. Is Mafco Liable for Breach of Paragraph 12 of the Tax Sharing Agreement?

Marvel's next claim is that Mafco breached the Tax Sharing Agreement by failing to compensate Marvel for the use of approximately $147 million in NOLs pursuant to paragraph 12 of the Tax Sharing Agreement. This claim was first raised by Marvel when it amended its complaint in February 2001.

### 1. Is Marvel's Paragraph 12 Breach of Contract Claim Time–Barred?

 Mafco first argues that Marvel's claim for breach of paragraph 12 of the Tax Sharing Agreement is time-barred because it was raised more than three years after the applicable three year limitations period. *See* Del.C. § 8106; *see also Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1128 (3d Cir.1990). Under Delaware law, the statute of limitations for breach of contract claims begins to run when the contract is breached. *Freedman v. Beneficial Corp.*, 406 F.Supp. 917, 923 (D.Del.1975). Mafco asserts that because the contract was allegedly breached on April 24, 1997, the date on which the Marvel Group was deconsolidated from the Mafco Group, Marvel's breach of contract claim is untimely.

 Marvel contends that its claim is not untimely because it relates back to

---

**6.** In its supplemental briefing, Marvel concedes that Mafco gained no tax benefits from its use of Marvel's NOLs. However, Marvel contends that Mafco unfairly enjoyed the following non-tax benefits: (i) cash flow benefits from monies paid to Mafco by Marvel under

the terms of the Agreement in 1993 and 1994; (ii) interest rate differential benefits based on Mafco's ability to negotiate a lower interest rate on bonds that it issued, due to monies it received from Marvel under the Agreement.

December 23, 1998, the date on which Marvel filed its initial complaint. *See* Fed. R.Civ.P. 15(c). Rule 15 of the Federal Rules of Civil Procedure allows a party to amend its complaint to assert a new claim, even if the statute of limitations has run on the new claim, if that claim "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ." *Id.* "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on the merits rather than on procedural technicalities." *United States v. Thomas,* 221 F.3d 430, 435 (3d Cir.2000) (internal quotes omitted).

 The court disagrees with Mafco's argument that this breach of contract claim is "completely different" from its original claims. It is simply another legal theory grounded in the same set of facts. Marvel's paragraph 12 breach of contract theory for relief arises out of the same conduct, transaction, and facts that were set forth in its initial complaint, because it relates to the Tax Sharing Agreement. Therefore, the initial complaint sufficiently put Mafco "on notice of the facts and claims that gave rise to" this later added claim. 3 James W. Moore et. al, Moore's Federal Practice, § 15.19 (Matthew Bender 3d ed.). Accordingly, the court finds that under Rule 15 this claim relates back to December 23, 2001, the date on which the plaintiffs filed their initial complaint. Because December 23, 1998 is within three years of April 24, 1997, plaintiffs' paragraph 12 breach of contract claim will be considered timely filed. The court will therefore turn to the merits of the claim.

2. *Is Mafco liable for Breaching Paragraph 12 of the Tax Sharing Agreement?*

 Paragraph 12 of the Tax Sharing Agreement, entitled *"Interpretation,"* states:

This Agreement is intended to calculate and allocate certain Federal and state and local income tax liabilities of the members of the [Mafco] Group and the Marvel Group, and any situation or circumstance concerning such calculation and allocation that is not specifically contemplated hereby or provided for herein shall be dealt with in a manner consistent with the underlying principles of calculation and allocation in this Agreement.

Marvel contends that because the Tax Sharing Agreement does not specifically address deconsolidation, the catch-all provision, paragraph 12, requires Mafco to pay Marvel Entertainment for its lost future use of NOLs generated while it was in the Mafco consolidated group. According to Marvel, compliance with paragraph 12 requires Mafco to compensate Marvel Entertainment for Mafco's use of its NOLs, because such compensation would be consistent with the underlying principles of the Agreement, which are to put the Marvel Group in the tax and economic position that it would have been in had it been a stand-alone consolidated tax-filing group. Thus, Marvel contends it is entitled to payments for NOLs that allegedly "would have provided future benefit to Marvel had the Marvel Group either: (1) remained part of the Mafco Group; or (2) always been a stand alone group."

Mafco argues in response that the language of the Agreement does not provide Marvel with any such post-deconsolidation entitlement and that paragraph 12 of the Agreement does not obligate Mafco to make any payments to Marvel after deconsolidation. Mafco's only obligations were to pay Marvel in accordance with paragraph 5, which it did. Mafco concludes, therefore, that Marvel's claim for

breach of paragraph 12 of the Agreement is not cognizable as a matter of law. To support its argument, Mafco focuses on paragraph 23 of the Agreement, which provides that "none of the parties hereto shall have any obligations or liabilities under this Agreement with respect to any Taxable Period during which Marvel is not a member of the [Mafco] Group...." Thus, the defendants reason that because Marvel has not been a member of the Mafco Group since April 1997, Marvel cannot invoke the "obligations and liabilities" of paragraph 12 to obtain any future benefits. In addition, Mafco argues that even if paragraph 23 does not expressly bar Marvel's breach of contract claim, the claim should nonetheless fail because in seeking a lump sum payment for the future use of its NOLs, it is not "consistent with the underlying principles of calculation and allocation in this Agreement," as paragraph 12 requires. Rather, Mafco asserts, Marvel's demands for payment to offset its potential tax liabilities in future years violates a fundamental principle of calculation and allocation in the Agreement. All such calculations and allocations apply only to a "Taxable Period," which is defined as "any taxable year or portion thereof ... with respect to which a consolidated Federal income tax return is properly filed on behalf of the Group which includes Marvel...."

As a threshold matter, the court does not agree with Mafco that paragraph 23 or the definition of "Taxable Period," necessarily bars, Marvel's claim. Marvel's claim is related to the disposition of stand-alone NOLs that were generated during "Taxable Periods" when it was a member of the Mafco consolidated tax group and a party to the Tax Sharing Agreement.

However, turning to the merits of Marvel's claim, the court concludes that Mafco did not breach paragraph 12 of the Agree-

ment. To find that Mafco breached paragraph 12 of the Tax Sharing Agreement, the court would have to interpret paragraph 12 in such a manner that would create the affirmative obligation in Mafco to pay Marvel for the future use of its NOLs, once it has already compensated Marvel in the manner set forth in section 5(b) of the Agreement. The court declines to do so.

Under the Agreement, if Marvel had taxable income, calculated as a stand-alone entity, Marvel would pay to Mafco the amount of its tax liability that it would have had to pay to the IRS. By contrast, if Marvel had a stand-alone NOL *and* it could have carried that NOL back to offset its taxable income in a prior tax year, Mafco would pay to Marvel the amount of the tax refund that it would have received from the IRS. The agreement does not state that Mafco had to compensate Marvel for the use of its NOL if Marvel could not carry that NOL back to any prior taxable year. Such a reading would be inconsistent with the principles of calculation and allocation as set forth in the Agreement.

A review of the parties' performance under the Agreement demonstrates that Mafco and Marvel did act under the agreement, "in a manner consistent with the underlying principles of calculation and allocation in [paragraph 5 of] this Agreement." In 1993, in consideration of its taxable income, Marvel paid to Mafco $12.7 million. In 1994, in consideration of its taxable income, Marvel paid to Mafco $13.7 million. In 1995, because Marvel generated a $61.8 million NOL that was could be fully offset by prior years income, Mafco paid to Marvel $15.2 million. In 1996, however, only $40 million of the $140 million NOL generated by Marvel could have been applied to offset Marvel's prior year's income. In accordance with the terms of

the agreement, Mafco compensated Marvel $10.4 million for that portion of the NOL that could be carried back. In 1997, none of Marvel's adjusted $47 million NOL could be carried back by Marvel. In accordance with the terms of the agreement, Mafco did not pay Marvel because no portion of the NOL could be carried back. This summary demonstrates that during each year that the Agreement was in effect, the parties complied with its terms. Accordingly, paragraph 12 should not be read to impose any additional obligation on Mafco to compensate Marvel for its loss of the future use of its NOLs.

During 1995, 1996, and 1997, as required by the IRC, Mafco applied Marvel's entire NOLs to its consolidated tax returns. While it is true that this action had the legal effect of preventing Marvel from ever using those NOLs in the future once it was deconsolidated from the Mafco tax group, nothing in the Agreement or the IRC mandates that Marvel must be compensated for NOLs generated while a member of a consolidated tax group. Moreover, in consideration of the ELA's that are triggered under the IRC upon deconsolidation, whose purpose is to adjust for any tax benefits that Mafco may have enjoyed from using Marvel NOLs during the period when Marvel was a member of its consolidated tax group, imposing an obligation upon Mafco to further compensate Marvel would make little sense.

## D. Can Marvel Avoid the Transfer of Its NOLs Under the Bankruptcy Code?

In Count III and IV of its Second Amended Complaint, Marvel raises claims under Bankruptcy Code sections 548 and 549 contending that the defendants' use of $147 million of Marvel Group's 1996 and April 24, 1997 NOLs constitutes both (i) a transfer of Marvel Group's interest in property in the year prior to the bankruptcy filing without the debtors "receiving reasonably equivalent value in exchange for such transfer" that is therefore avoidable under section 548; and (ii) a post-petition transfer of Marvel Group's interest in property that was not authorized by the Bankruptcy Code or any order of the court that is avoidable under section 549. *See* 11 U.S.C. §§ 548(a)(1), 549, and 363; *In re Roth American*, 975 F.2d 949, 952 n. 3 (3d Cir.1992) (stating transfers taken outside the ordinary course for which court approval has not been obtained are avoidable). Bankruptcy Code section 548 provides that a debtor may "avoid any transfer of an interest of the debtor in property . . . that was made . . . within one year before the date of the filing of the petition" where the debtor "received less than a reasonably equivalent value." 11 U.S.C. § 548(a)(1). Bankruptcy Code section 549, provides that a debtor "may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under the [Bankruptcy Code] or by the court." 11 U.S.C. § 549(a).

Mafco, in opposition, asserts (i) that the consolidation of financial results for a tax calculation does not amount to a "transfer" of NOLs between members of a consolidated tax group, within the meaning of section 548 or 549; (ii) that as a member of the Mafco consolidated group, Marvel did not hold an ownership interest in its NOLs because the existence of its own stand-alone NOLs while a member of the consolidated group was merely hypothetical, *see United Dominion Indus. v. United States*, 532 U.S. 822, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001), and thus could not transfer them within the meaning of sections 548 and 549, and (iii) that even if the court were to consider the transactions "transfers" or property "owned" by Marvel, Marvel's post-petition section 549 claim must fail

both because the post-petition transfer was authorized by an order of the bankruptcy court and was otherwise authorized by the Bankruptcy Code because they were effected in the ordinary course of Marvel's business. Moreover, Mafco contends that, as a matter of policy, the alleged transfers of NOLs should not implicate the avoidance power because the NOLs have no value to Marvel. *See Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) ("If the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated.").

To resolve this dispute, the court must first determine whether there was a transfer of property in which Marvel had an ownership interest that would implicate the avoidable transfer sections of the Bankruptcy Code. *See* 11 U.S.C. §§ 548(a)(1) and 549(a); *see also Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.),* 207 B.R. 391, 397 (Bankr.E.D.N.Y.1997) (threshold question under section 549 is whether transfer of estate property occurred); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 201 B.R. 19, 22 (Bankr.D.Mass.1996) ("for a transfer to be avoided as fraudulent it is necessary that the debtor make an actual transfer"). Bankruptcy Code section 101(54) defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . . ." 11 U.S.C. § 101(54).

It is undisputed that Mafco, in accordance with the IRC, filed consolidated federal income tax returns for its consolidated group and in doing so was required to apply the group's consolidated NOLs—including income and losses generated by all members of the group. Mafco, as the group's parent corporation, was responsible for filing the consolidated federal income tax return and for paying any federal income tax due on behalf of all group members. *See* 26 C.F.R. §§ 1.1502–6. In order to calculate the federal taxable income of the Mafco consolidated group, each member had to first calculate its taxable income in approximately the same manner as if it were filing its own federal income tax return; the items that would have appeared on the individual members' returns were than aggregated, with certain adjustments to account for consolidation. *See* 26 C.F.R. §§ 1.1502–11, 1.1502–12; *see also* Federal Income Taxation of Corporations and Shareholders ¶ 113.43 (Warren, Gorham & Lamont, 6th ed.1998) (explaining that a consolidated federal income tax return reflects the income and losses of a consolidated tax group as a single entity). The NOLs were computed and applied to the group entity on a consolidated basis in accordance with IRC section 172. Mafco did not have discretion as to whether to "take" NOLs from its group members; rather, the manner in which NOLs were consolidated and applied was statutorily mandated. *See Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 424 (Bankr.S.D.N.Y. 1998) ("the parent has no discretion; the consolidated NOL is applied to prior years in the statutorily mandated order, and then carried forward only if the prior years' consolidated income does not fully absorb it.").

Thus, during the period that Mafco was required to file returns on behalf of the entire consolidated group, it was the application of tax consolidation principles and the IRC that resulted in certain tax attributes of the group being diminished or eliminated. Moreover, as a result of this regulatory scheme provided for in the federal income tax laws for consolidated tax groups, the individual members of the

Mafco consolidated group did not possess separate tax attributes such as NOLs. *See United Dominion Indus.*, 532 U.S. 822, 121 S.Ct. 1934, 150 L.Ed.2d 45 (concept of separate NOLs for individual members of a consolidated tax group does not exist). In the context of the consolidated tax filing group, the *hypothetical* stand-alone NOLs that were calculated for the purposes of the Tax Sharing Agreement were not property of the debtor because they were a legal fiction. Thus, no actual transfer occurred when those NOLs were applied to the calculation of income tax due. Accordingly, the court finds that Mafco's application of NOLs attributable to Marvel in the federal income tax filings of the Mafco consolidated group does not constitute a transfer from Marvel to Mafco that is cognizable under the Bankruptcy Code.

The deconsolidation of Marvel from the Mafco Group, which was caused by a change in control of Marvel's majority ownership, also did not cause a transfer for the purposes of the Bankruptcy Code. Marvel and the other members of the Mafco Group did not make an election in 1997 to consolidate their tax attributes as part of a consolidated group. As a result of the deconsolidation, Marvel had two tax years in 1997, one as a member of the Mafco Group and one when it was filing independently. While the method of calculating Marvel's taxes changed as a result of the deconsolidation, there was no transfer of property between Marvel and Mafco. Rather, Marvel's NOLs were attributed to the entire consolidated tax group pursuant to the tax laws.[7] While courts have avoid-

ed or stayed conduct that could have affected the existence or usefulness of NOLs to a debtor, *see, e.g. Gibson v. United States (In re Russell)*, 927 F.2d 413 (8th Cir.1991) (debtor's election to carry forward an NOL avoided), in this case the plaintiffs do not challenge any conduct that would have affected the viability or existence of the NOLs; they merely complain that the Mafco Group computed its tax liabilities and filed its tax return as required by the IRC. Such a transaction cannot constitute an avoidable transfer.

**E.** *Is Mafco Liable for Breaching Paragraph 8(b) of the Tax Sharing Agreement?*

Marvel also asserts that Mafco is liable for breaching paragraph 8(b) of the Tax Sharing Agreement. Paragraph 8(b) creates a mutual duty of cooperation among the parties to the Agreement, stating that each "shall provide one another with such information concerning such returns and the application of payments made under this Agreement as [each party] may reasonably request of one another." Marvel asserts that Mafco breached this provision of the Agreement by failing to provide to Marvel Entertainment tax returns and work papers from Mafco and its advisors. Mafco, in response, asserts that this claim is moot because "Mafco provided Plaintiffs with copies of these returns and work papers, and Plaintiffs received thousands more documents related to the tax returns and work papers from Mafco's advisors."

While conceding that it has received a multitude of documents, Marvel disagrees

---

7. Mafco correctly notes that the only allegedly offensive "act" or "transfer" occurred, if at all, when Marvel became a member of the consolidated tax group on May 19, 1993, thereby causing its *tax liabilities to be calculated* as a single entity with the other members of the Mafco consolidated tax group. This purported transfer, however, occurred more than three and a half years before the

bankruptcy petitions were filed and therefore falls outside of the reach of Section 548 and 549. *See* 11 U.S.C. § 549(a)(1) (granting trustee the ability to avoid a transfer that occurs after the commencement of the case); 11 U.S.C. § 548(a)(1) (trustee may avoid transfer that was made within one year before the date of the filing of the petition).

that its claim is moot because, it claims, "certain key work papers and analyses still have not been produced that simply must exist." According to the second amended complaint, one of the reasons that Marvel requested these work papers was to investigate whether the $18 million of NOLs that was apportioned to the Marvel Group by Mafco upon deconsolidation in 1997 was the proper allocation amount. Marvel asserts that "Mafco has failed to produce work papers or related analyses that show why the amount of NOLs apportioned to Marvel upon deconsolidation in 1997 was approximately one-half of what Mafco originally projected" and contends that certain documents that have been produced, such as a 1997 Ernst & Young Memorandum, suggest that Mafco's tax accountants were urged to find ways to reduce the amount of NOLs apportioned to Marvel.

This issue was briefed as part of Mafco's motion for summary judgment. In this opinion the court has, at the urging of the parties, elected to consider that motion as the basis for resolving the liability issues in the case. However, as opposed to the other three claims that the court has addressed in this opinion, in which only legal issues remained in dispute, there are factual issues that remain in dispute with respect to this claim. Put simply, Marvel contends that Mafco's disclosures were not complete, while Mafco asserts that they were.

In its second amended complaint, the relief that Marvel requests on this breach of contract claim is "that the Court enter an order requiring Mafco Holdings to provide Marvel Entertainment with copies of the Mafco Group's tax returns and related work papers for the years 1993 thought 1997." Based on the lack of factual record concerning this issue, the court is not in a position to rule on whether Mafco has already complied with its obligation to cooperate in the production of documents that Marvel would reasonably request. In essence, at this point in the case, the paragraph 8(b) breach of contract claim appears to be a discovery dispute relating to the apportionment of NOLs upon consolidation. Based on its above findings that Mafco has no liability to Marvel under Marvel's theories of breach of fiduciary duty, breach of contract, or avoidable transfer, this claim appears to be moot. To the extent Marvel desires to pursue its paragraph 8(b) claim as an independent claim against Mafco, despite the court's findings with respect to its other claims, Marvel may petition the court to do so.

### iii. *CONCLUSION*

For the reasons stated above the court finds that Mafco and the director defendants are not liable to Marvel under either of the three theories set forth in Marvel's complaint. The breach of fiduciary duty claim is time-barred, and even if the court were to substantively entertain the claim, the court would find no breach of fiduciary duty on the merits. Next, based on the language of the Tax Sharing Agreement, the court finds that Mafco did not breach paragraph 12 breach of that Agreement. Finally, Marvel's avoidable transfer claims cannot succeed as a matter of law because the consolidation of Marvel's NOLs onto Mafco's consolidated tax form, while Marvel was a member of Mafco's consolidated tax group, is not a "transfer" that is cognizable under the Bankruptcy Code. Given that these findings will resolve the case in favor of Mafco, the court finds Marvel's paragraph 8(b) breach of contract claim, pursuant to which it seeks further discovery, to be moot.

The court will issue an order consistent with this opinion.