# Virgil Aiello & another[1] vs. Gerald Aiello & others[2] (and a companion case[3]).

Suffolk. April 6, 2006. - August 11, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Corporation,* Stockholder's derivative suit, Adverse domination doctrine. *Practice, Civil,* Appeal, Interlocutory appeal. *Judicial Estoppel. Limitations, Statute of.*

In a receivership proceeding, a party's objections to interlocutory orders regarding the distribution of assets satisfied the requirements of Mass. R. A. P. 3 (a), as amended, 378 Mass. 927 (1979), and enabled her later to appeal from the orders after the entry of final judgment [397-398], and the party was not barred from bringing her appeal under the equitable doctrine of judicial estoppel [398-399].

This court expressly adopted the "doctrine of adverse domination," which equitably tolls the statute of limitations in shareholder derivative actions while a corporate plaintiff continues under the domination of the culpable directors [399-401]; further, this court concluded that the "complete domination test" — under which the plaintiff seeking to toll the statute of limitations must show that the culpable directors had full, complete, and exclusive control for the period at issue, so that there was no director or shareholder with knowledge who could have induced the corporation to bring an action — was the more appropriate analytic tool for implementing that doctrine where a shareholder, as a nonculpable director, had knowledge of the wrongful acts committed against the corporation [401-406].

In receivership proceedings involving the disbursement of assets of a closely held corporation owned in equal shares by four siblings, who also served as its board of directors, the judge did not err in concluding that the claims of the plaintiff, who sought a distribution from the receiver in excess of her twenty-five per cent interest in the corporation on the basis of claims asserted derivatively on behalf of the corporation, were barred by the applicable statute of limitations, where the plaintiff was both a shareholder and a disinterested corporate director of the corporation, was well aware of the derivative claims that could have been brought against the culpable directors (her brothers) for their alleged breaches of fiduciary duty and instances of self-dealing, and had the opportunity and motivation to bring those claims before she asserted them in receivership proceedings. [406-407]

[1]Robert Aiello.

[2]Joy Hyland and DeLuca's Market, Inc. (DeLuca's).

[3]Gerald Aiello & another *vs.* Virgil Aiello & others.

CIVIL ACTIONS commenced in the Superior Court Department on April 2 and April 5, 2001, respectively.

After consolidation, the cases were heard by *Allan van Gestel*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jeffrey J. Upton* for Joy Hyland.

*W. Paul Needham* (*Mark A. Johnson* with him) for Robert Aiello.

*Howard M. Brown* for Gerald Aiello.

CORDY, J. This case involves the dissolution of a closely held corporation owned in equal shares by four siblings, who also served as its board of directors. After two rounds of acrimonious litigation among the siblings, a judge in the Superior Court dissolved the corporation and appointed a receiver to wind up the affairs of the business and recommend the fair disbursement of corporate assets.

In the course of the receivership proceedings, one of the siblings, Joy Hyland (Joy),[4] claimed that her three brothers had, for decades, improperly benefited themselves at the expense of the corporation, DeLuca's Market, Inc. (DeLuca's), through the payment of excessive compensation, the diversion of corporate opportunities, and other breaches of fiduciary duty and instances of self-dealing. Consequently, she sought a distribution from the receiver of assets in excess of her twenty-five per cent interest in the corporation. After the receiver had investigated the claims, he recommended (and the judge approved) a distribution to Joy that was greater than her pro rata share of DeLuca's assets, but less than the amount she sought. These appeals, which we transferred to this court on our own motion, followed.

In her appeals, Joy faults the receiver and the judge for concluding that most of her claims — asserted derivatively on behalf of the corporation — were barred by the statute of limitations. While not disputing that a three-year statute of limitations applied to the claims, and that they arose more than three years before their filing with the receiver, Joy contends that the statute of limitations should have been tolled because

___

[4]For ease of references, we refer to the siblings by their first names.

her brothers constituted a majority of DeLuca's board of directors and, as such, controlled, or dominated, the board's decision-making authority.[5] Relying on *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997) (*Demoulas*), Joy asserts that the "adverse domination doctrine" tolls the statute of limitations in such circumstances until a majority of the board of directors are disinterested, and thus willing to contemplate instituting a lawsuit by the corporation against the culpable directors — in this case, her brothers.

In response, Gerald and Robert contend that (1) in *Demoulas*, this court did not adopt the adverse domination doctrine and this case should be governed by our traditional repudiation of trust and fraudulent concealment doctrines; (2) if the court adopted the adverse domination doctrine in *Demoulas* (or chooses to adopt it now), it did not and should not apply the "disinterested majority" version of the doctrine (as suggested by Joy); and (3) the more appropriate version of the adverse domination doctrine — the "complete domination" version — would not toll the statute of limitations where, as here, Joy served as a director of the corporation, had long-standing knowledge of the claims she now asserts, and as a shareholder could have brought a derivative action on behalf of the corporation.[6]

We transferred the cases to address questions arising from our *Demoulas* decision. As foreshadowed by that case, we now

---

[5] Joy also appeals from the judge's rulings regarding the scope and application of the corporate opportunity doctrine. Our conclusion that the statute of limitations bars her claims makes it unnecessary for us to address this issue.

[6] Gerald also argues cogently that regardless whether the statute of limitations on Joy's derivative claims is tolled, the claims were assets of DeLuca's, placed under the receiver's control, which, in the exercise of sound business judgment, the receiver determined not to pursue. He further argues that the receiver was authorized to make such a decision, see *Boucher* v. *Hamilton Mfg. Co.*, 259 Mass. 259, 270 (1927), and the judge did not abuse his discretion in ratifying it in the circumstances presented, and in light of the receiver's extensive findings regarding Joy's long-standing awareness of the claims and her neglect in pursuing prior opportunities to assert them. *Plumer* v. *Houghton & Dutton Co.*, 277 Mass. 209, 220-221 (1931) (disposition of assets in hands of receiver "rests mainly in sound judicial discretion"). Joy counters this argument by contending that the exercise of business judgment by the receiver was materially affected by the judge's ruling that her claims were barred by the statute of limitations.

adopt the "doctrine of adverse domination" as a form of equit-able tolling in the Commonwealth. We also conclude that the complete domination test — and not the disinterested majority test — was appropriately chosen and applied by the judge in the circumstances of these cases. Under the former test, the statute of limitations is not tolled by reason of adverse domination un-less the plaintiff can show the absence of any corporate director or shareholder who had actual knowledge of the alleged wrongdoing and the ability (and motivation) to sue the wrongdo-ers on behalf of the corporation or induce such a suit. See *Farmers & Merchants Nat'l Bank* v. *Bryan*, 902 F.2d 1520, 1523 (10th Cir. 1990); *In re Marvel Entertainment Group, Inc.*, 273 B.R. 58, 75-76 (Bankr. D. Del. 2002); *International Rys. of Cent. Am.* v. *United Fruit Co.*, 373 F.2d 408, 414 (2d Cir.), cert. denied, 387 U.S. 921 (1967) (*United Fruit*); *Clark* v. *Milam*, 192 W. Va. 398, 404 (1994).

Insofar as the judge, adopting the findings and recommenda-tions of the receiver, concluded that Joy was a shareholder and a disinterested corporate director, was well aware of the deriva-tive claims that could have been brought against her brothers, and had the opportunity (and motivation) to bring those claims long before asserting them in the receivership, we affirm his ruling that the statute of limitations was not tolled, and that the claims are time barred.

1. *Background.*[7] Gerald, Robert, and Virgil Aiello, and their sister, Joy, each owned twenty-five per cent of DeLuca's, a Mas-sachusetts corporation.[8] They also constituted DeLuca's board of directors. Since at least 1966, DeLuca's operated a neighbor-hood grocery store on Charles Street in Boston. The property from which the store operated was owned by their uncle until his death in November, 1997. Gerald, Robert, and Virgil took

---

[7]We recount the facts essentially as set forth in the report and recommenda-tion of the receiver on the claims submitted by the parties, filed on August 15, 2002, and implicitly adopted by the judge thereafter. Joy does not challenge the facts recited in the receiver's report, at least for purposes of this appeal, and no other party contests those facts in any relevant manner.

[8]We recognize the tangential dispute between the parties over the number of shares each acquired and the dates of the acquisitions. However, for purposes of this appeal, we treat the parties as twenty-five per cent shareholders in De-Luca's, as did the receiver.

day-to-day responsibility for the operations of the store and the corporation after Joy moved to Florida in 1984.

Between 1970 and 1987, the three brothers acquired six parcels of real estate. In 1977, they began running a grocery store at the property located on Newbury Street in Boston. The store, named "DeLuca's Market Back Bay," was operated by the brothers as a general partnership separate from DeLuca's. However, some or all of the brothers received compensation from DeLuca's for their work at this new store. For purposes of this appeal, we assume that Joy was not consulted about the establishment of either the partnership or the store, and was not offered an opportunity to participate in the venture.[9] In addition, each brother formed a side business (a wine importation business established in 1974, a produce wholesale operation established in 1976, and a consulting company established in 1988) that received payments for services rendered from DeLuca's.

Gerald left the operation of the Charles Street store in 1987, but returned in 1990. On his return, he unilaterally paid himself a lump sum of $316,851.[10] Discovery of this payment led to a dispute among the directors, and the board eventually voted to garnish Gerald's future earnings to reimburse DeLuca's for the $316,851.[11] Nonetheless, this payment and subsequent conversations between Joy and Gerald made Joy suspicious about the financial workings of DeLuca's. In March, 1994, she confronted Robert and Virgil about the disparity between her compensation and their own. The disparity extended back as far as 1981, and Joy was told that the pay difference was a result of the brothers' involvement in the day to day, full-time operation of the store after she had moved to Florida. Unsatisfied, Joy hired an accountant to investigate the disparities in the compensation of of-

---

[9] A third store was opened in Belmont in 1988 by the brothers, although they did, later, invite Joy to buy in to this store by purchasing the twenty-three per cent interest the Charles Street store had obtained in the store by providing that percentage of the acquisition money. The Belmont store did not thrive financially, and was sold in 1992.

[10] When Gerald left DeLuca's in 1987, he also received a payment of $1,100,000 for "earned but unpaid" compensation.

[11] By the time the receiver issued his report, DeLuca's had apparently recouped over $218,000 of the $316,851.

ficers, payments to directors, and amounts received by shareholders. Throughout 1995, Virgil, Robert, and Gerald provided Joy with financial documents belonging to DeLuca's, including its tax returns.

Sometime during (and likely before) Joy's conversations with Gerald and her investigation into DeLuca's financial operations, she also became aware of the brothers' other business ventures. These ventures (and various related real estate transactions) were the subject of discussion at a DeLuca's board meeting, attended by Joy, in 1996. Discussions among the four board members concerning these ventures and other "fairness" issues continued through 1997.

Any chance for an amicable resolution of the disputes regarding compensation and outside business ventures dissipated after their uncle died in 1997. The uncle had placed the Charles Street property in trust, and, unbeknownst to the siblings, had divided the beneficial shares of the trust unequally between them: Gerald received a three-sevenths interest; Joy, a two-sevenths interest; and Robert and Virgil apparently each received a one-seventh interest. Robert was named one of the trustees. In 1998, Virgil offered to buy the property from the trustees and the trustees accepted his offer. Gerald immediately filed suit against Robert, Virgil, and Joy, seeking to enjoin the sale and also to retain the $316,851 he had unilaterally paid to himself in 1990, but which the board had voted to recoup.[12] The court declined to enjoin the sale, and a jury returned a verdict in favor of Robert and Virgil on the recoupment claim. Joy, however, filed a separate action in Florida, where their uncle's estate was being probated, and succeeded in enjoining the sale.

In 2000, apparently in response to this first round of litigation, Robert and Virgil brought an action against Gerald and Joy asserting claims of breach of fiduciary duty.[13] Joy and Gerald filed counterclaims against Robert and Virgil. Joy's counter-

---

[12]Gerald's claim also alleged other breaches of fiduciary duty and wrongdoing by Robert, Virgil, and Joy. Gerald agreed to dismiss Joy from the suit. She filed no counterclaim or cross claim.

[13]The case was entered in Middlesex County but eventually transferred to the business litigation session of the Superior Court in Suffolk County. The lawsuit was predicated on three events: (1) Joy and Gerald's increase of the rent DeLuca's had to pay to operate at the Charles Street property; (2) Joy's

claims alleged breach of fiduciary duty, including the diversion of corporate opportunities and self-dealing. Summary judgment was entered for Joy and Gerald on all claims against them, and the judge determined to dissolve DeLuca's pursuant to G. L. c. 156B, § 99, as sought by Gerald in a separate action that had been consolidated with the case.[14] After the judge appointed a receiver to wind up the affairs of the business and distribute the assets, Joy voluntarily dismissed the counterclaims she had brought against Robert and Virgil.[15]

With the approval of the judge, the receiver directed all parties to submit to him, on or before May 17, 2002,[16] requests and supporting documentation "for all amounts they claim are due and owing to them." In response, the parties each submitted claims essentially seeking more than their pro rata (twenty-five per cent) share of DeLuca's assets. In Joy's submission, she claimed that her brothers had received excessive compensation from DeLuca's, had opened additional grocery stores and acquired real estate for their own purposes without properly bringing these opportunities to the attention of DeLuca's board of directors, and had formed companies that did business with DeLuca's without seeking informed consent from DeLuca's disinterested board member. These claims substantially mirrored those set forth in Joy's earlier counterclaim.

On August 15, 2002, after his initial investigation of the claims, the receiver filed a report and recommendation in the Superior Court, that, in part, sought rulings from the judge on certain legal questions, including the application of the statute of limitations to the claims submitted by the parties.[17] To aid the judge in this endeavor, the receiver made a series of recommendations based on his review of the parties' submissions.

causing Robert to be removed from his position as trustee of the DeLuca trust; and (3) Gerald's bringing an unsuccessful lawsuit against Robert.

[14]Although not entirely clear from the record, it appears that Gerald sought dissolution of the corporation based on his brothers' continued payment of excessive compensation to themselves, the earned compensation withheld from him by the corporation, and other alleged breaches of fiduciary duty.

[15]Gerald's counterclaims were stayed pending resolution of the receivership.

[16]The original deadline for submissions of claims was April 12, 2002. A later order extended the deadline until May 17, 2002.

[17]The receiver also sought, inter alia, rulings of law on the scope of the corporate opportunity doctrine as it related to this case.

With respect to Joy's claims, the report recited the following facts (not disputed here):

"[A]ll of the parties were well aware of the various claims against each other for excessive compensation, diversion of corporate opportunities, etc. at least by 1994, and they may have had knowledge of these claims as far back as the mid-1980s. Indeed, in March 1994, Joy acknowledged in writing the disparity between what Robert, Virgil and Gerald took out of the businesses versus what she was receiving. She questioned why she has not received more from [DeLuca's] going back prior to 1983. Joy's accountant received tax returns and financial information back twenty-eight (28) years to 1967. Joy was well aware of the Back Bay Store and in fact asserted that Back Bay was a corporate opportunity diverted by her brothers at least by October 16, 1995. . . .

"Joy also knew of her claims against Virgil and Robert at the time Gerald commenced the Middlesex Lawsuit [1998]. She had the opportunity to assert them at that time. Joy and her accountant had been discussing the 'fairness' issues, Back Bay, [the brothers' side businesses], and a host of other fiduciary duty and corporate opportunity issues starting in 1994. While Joy initially was represented by the same lawyer who represented Virgil and Robert in the Middlesex Lawsuit, at some point shortly after the Lawsuit was filed, it became apparent that Robert, Virgil and Joy had conflicting interests and each obtained his or her own counsel. The change in counsel indicates that Joy knew her interests were different than or adverse to the interests of Robert and Virgil. Joy had the opportunity to join in Gerald's lawsuit, assert her own counterclaims or cross claims against Virgil, Robert or Gerald, sue derivatively on behalf of DeLuca's . . . or do nothing. She chose the [latter] course and was dismissed from the case by Gerald. There is no explanation . . . by Joy . . . as to why [she] decided not to pursue these matters she now claims were so egregious as to be unconscionable . . . ."

On December 2, 2002, after briefing by the parties, the judge accepted the report and recommendations of the receiver,

determined that the three-year statute of limitations applicable to actions sounding in tort applied to the parties' claims, and ruled that, with the exception of claims not relevant here, all claims accruing more than three years before May 17, 2002, were time barred. The judge also went on to find:

> "As for any claims of Joy that are personal to her, she certainly had ample knowledge, or was in a position where she should have had ample knowledge, of them accruing prior to May 17, 1999. Similarly, as to any claims that she may seek to assert derivatively on behalf of DeLuca's . . . her state of knowledge is equally sufficient to bar tolling. Further, there was nothing in her minority shareholder position that prevented her from pursuing such derivative claims . . . ."

The judge then specifically rejected Joy's contention, based on the "adverse domination" doctrine, that the start of the limitations period on her derivative claims should be tolled until a majority of DeLuca's board was occupied by disinterested parties. Noting that the theory Joy proposed — the "disinterested majority" test — would essentially bar the applicability of any statute of limitations to a derivative suit in "demand excused cases,"[18] the judge instead adopted the "complete domination" test. This test would toll the statute of limitations only when there were no informed, disinterested corporate directors (or shareholders) able to bring a derivative action on behalf of the corporation. Because the judge determined that Joy had sufficient knowledge and the ability to bring such an action, he held that the statute of limitations was not tolled.[19] Joy filed a motion for reconsideration of the judge's ruling which was denied on December 18, 2002.

---

[18]Demand excused cases are cases where a shareholder is excused from making a demand on a corporation's board of directors before instituting a derivative action on the corporation's behalf. Making such a demand is ordinarily excused where it would be a pointless act, for example, where a majority of the board would have their interests threatened by, or might be culpable persons in the action. See *Harhen* v. *Brown*, 431 Mass. 838, 842-844 (2000).

[19]Additionally, the judge ruled that only the operation of a grocery store, and not the purchase of real estate (even for eventual use as a grocery store), was a corporate opportunity. In light of our ruling on the statute of limitations issue, it is unnecessary for us to review this ruling.

Thereafter, the receiver filed a supplemental report and recommendation, recommending that, in addition to her pro rata share, Joy receive $225,000 because of the excessive compensation taken by Virgil, Robert, and Gerald *after* May 17, 1999. The receiver also recommended awarding Joy twenty-five per cent of the assets from the receiver's sale of DeLuca's Market Back Bay (the grocery store operated by her brothers through a general partnership), whose dissolution in a separate action had been combined with DeLuca's, and whose assets had been placed under the same receiver. Finally, the receiver rejected all of Joy's other claims (and declined to bring suit against the other directors) as barred by the statute of limitations because she had actual knowledge of the facts underlying those claims prior to May 17, 1999. The judge approved the receiver's supplemental report on May 27, 2003, and ordered the receiver to render and submit a final accounting.

The receiver's final report and accounting was approved by the judge on September 5, 2003. A further report regarding the distribution of assets was filed on December 21, 2004. The judge approved this report and discharged the receiver on January 5, 2005. Judgment entered in the dissolution action on the same day. On January 31, 2005, Joy filed an appeal of the January 5, 2005, judgment; the December 2, 2002, order; and the December 18, 2002, denial of her motion for reconsideration of the December 2 order.

2. *Propriety of the appeal.* As a threshold issue, Gerald argues that we should dismiss Joy's appeal (taken after the entry of final judgment) because it is essentially a challenge to the judge's approvals of the receiver's reports and recommendations regarding the tolling of the statute of limitations, the distribution of corporate assets, and the discharge of the receiver, which were not appealed at the time they were entered.

Gerald relies on *Shannon* v. *Shepard Mfg. Co.*, 230 Mass. 224 (1918), for the proposition that the orders from which Joy failed to appeal were final and appealable, and that she was thus required to appeal from those orders within thirty days of their respective dates of entry. Although the *Shannon* case states that such orders are "final at least to the extent of *permitting* an interested party to appeal from it" (emphasis added), *id.* at 229,

the decision neither explicitly nor implicitly suggests that the failure to appeal from such an order forfeits a party's right later to appeal from the order after final judgment has entered.

More importantly, the subsequent enactment of Mass. R. A. P. 3 (a), as amended, 378 Mass. 927 (1979), controls:

> "[A] party need not claim an appeal from an interlocutory order to preserve his right to have such order reviewed upon appeal from the final judgment; but for all purposes for which an appeal from an interlocutory order has heretofore been necessary, it is sufficient that the party comply with the requirement of Massachusetts Rule of Civil Procedure 46 . . . ."

Assuming that an appeal from the judge's orders in this case had "heretofore been necessary," Mass. R. Civ. P. 46, 365 Mass. 811 (1974), explains that "for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court."

When the parties briefed the issues of law in advance of the judge's December 2, 2002, ruling on the statute of limitations, Joy made her position as to tolling clear to the judge and to the opposing parties. Moreover, after the judge rejected her position, she sought reconsideration of that portion of the order related to whether the statute of limitations had been tolled. Where the receiver's subsequent reports and recommendations, the judge's subsequent orders, and the final judgment relied in significant part on the determinations made by the judge in his order of December 2, 2002, Joy's objections to that order sufficed to put the court and opposing parties on notice that she objected to any subsequent reports and orders that might be based thereon. Her actions satisfy the requirement of rule 3 (a).

In the alternative, Gerald suggests that we consider Joy "estopped" from bringing her appeal because she accepted a distribution of DeLuca's assets that was significantly larger than her pro rata share. Gerald contends that having received the benefits of the receiver's report and recommendation regarding the distribution of assets (particularly without pursuing an

interlocutory appeal), it would be unfair now to allow her to seek further relief with respect to her claims.

" 'Judicial estoppel is an equitable doctrine that precludes a party from asserting a position in one legal proceeding that is contrary to a position it had previously asserted in another proceeding.' *Blanchette* v. *School Comm. of Westwood*, 427 Mass. 176, 184 (1998). . . . [T]wo fundamental elements are widely recognized as comprising the core of a claim of judicial estoppel. First, the position being asserted in the litigation must be 'directly inconsistent,' meaning 'mutually exclusive' of, the position asserted in a prior proceeding. . . . We have rejected claims of judicial estoppel where the position being asserted is not directly contrary to the position previously asserted. . . . Second, the party must have succeeded in convincing the court to accept its prior position. . . . [J]udicial estoppel will normally be appropriate whenever 'a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of a legal advantage.' *InterGen N.V.* v. *Grina*, 344 F.3d 133, 144 (1st Cir. 2003)." (Citations omitted.) *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-641 (2005). "Application of the equitable principle of judicial estoppel to a particular case is a matter of discretion." *Id.* at 640, and cases cited.

The doctrine is not applicable here. In the proceedings in the Superior Court, Joy consistently objected to the recommendations of the receiver and orders of the judge from which she now appeals. Her acceptance of a disproportionate distribution of assets does not signify otherwise, as her appeal is predicated on the contention that she is owed more than her award. Further, there is no suggestion that either the receiver or Joy's brothers were induced in any manner to believe her acceptance of the distribution altered her underlying position concerning the total amount of monies to which she was entitled, and distribution was not predicated on any condition not to appeal from the recommendations of the receiver or the judgment.

3. *Statute of limitations.* Joy contends that the statute of limitations did not run on any of her claims because the statute was tolled until the date the judge dissolved DeLuca's and ap-

pointed a receiver.[20] Because her claims were all brought within three years of that date, she asserts their timeliness.[21] We disagree.

The detailed and unchallenged factual record set forth in the receiver's reports and recommendations fully supports the conclusion that Joy had actual knowledge of the facts underlying the claims she filed with the receiver long before May 17, 1999. She contends, however, that even with this knowledge, the statute of limitations should have been tolled until the time when her brothers no longer controlled DeLuca's board. Joy's argument is based on the doctrine of adverse domination: "[g]enerally, the statute [of limitations] is tolled while a corporate plaintiff continues under the domination of the wrongdoers." 3A W. Fletcher, Private Corporations § 1306.20, at 466-467 (2002).

In *Demoulas, supra* at 523-524, this court outlined two "versions" of the adverse domination doctrine. We explained that "the most common [version] is the 'disinterested majority' test, under which the statute does not run until a majority of board members are disinterested and the board is therefore able to act on behalf of the corporation against the wrongdoer." *Id.*, and cases cited. We also recognized that "[o]ther courts have proposed a stricter 'complete domination' test, under which a plaintiff seeking to toll the statute of limitations must show that the culpable directors had full, complete, and exclusive control for the period at issue, so that there was no director or shareholder with knowledge who could have induced the corporation to bring an action." *Id.* at 524, and cases cited. We concluded that "[a]pplication of either version of the adverse domination doctrine would support tolling the statute of limitations [in *Demoulas*], because [the alleged wrongdoers] had

----

[20]Some jurisdictions analyze statute of limitations questions involving the adverse domination doctrine by asking whether the statute was tolled, while others by asking whether the claim ever accrued for limitations purposes. We need not enter that debate because we conclude that, however analyzed, Joy cannot benefit from the doctrine.

[21]It is not clear from the record whether Joy submitted her claims to the receiver on May 17, 2002, or a few days earlier. However, in the circumstances of this case, a few days does not alter the outcome. We therefore treat the deadline for submissions to the receiver as the date of the assertion of the claims.

complete and exclusive control of [the relevant corporations'] boards." *Id.*

To the extent that our reference to the adverse domination doctrine in *Demoulas* constituted dictum,[22] we now expressly recognize that a statute of limitations may be tolled where the requirements of the adverse domination doctrine are established. We also agree with the Superior Court judge that the complete domination test is the more appropriate analytic tool for implementing the adverse domination doctrine where there is a shareholder who, as a nonculpable director, has knowledge of wrongful acts committed against the corporation.[23] This test better serves the purposes of the adverse domination doctrine,

---

[22]Before addressing the adverse domination doctrine, the *Demoulas* court had determined that the statute of limitations should be tolled because the plaintiff "lacked actual knowledge of the diversions of corporate opportunities and instances of self-dealing that are the basis of the claims." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 522 (1997) (*Demoulas*). We concluded that the repudiation of trust and fraudulent concealment doctrines worked to bar the accrual of the statute of limitations. See *id.* at 518-522. As we discuss below, actual knowledge is also required under both versions of the adverse domination test and is thus a precondition to the second question of control under the doctrine. Because the plaintiff lacked actual knowledge in *Demoulas*, our discussion of the rest of the adverse domination doctrine was, technically, unnecessary to our holding. Nonetheless, the *Demoulas* court clearly suggested that the domination of a corporation by wrongdoers might be "a further basis . . . for tolling the limitations period." *Id.* at 522.

[23]We reject Joy's assertion that the "only difference between" the "disinterested majority" test and the "complete domination" test (otherwise known as the "single disinterested director" rule, *Hecht* v. *Resolution Trust Corp.*, 333 Md. 324, 347 [1994]), "is which party bears the burden of proving that the statute of limitations has been tolled." Legal commentators and courts alike have recognized that the differences between the two versions of the adverse domination doctrine can be far more substantive and significant than Joy suggests. See, e.g., Mayor, Financial Institutions Fraud, 31 Am. Crim. L. Rev. 647, 670-671 (1994) ("[U]nder the [disinterested] majority rule, the statute of limitations begins to run after a disinterested majority of non-culpable directors assumes control of the institution. . . . Under the 'complete' domination theory [the limitations period begins] when . . . independent directors take positions within the institution, regardless of whether or not they constitute a majority"); Comment, Defining the Boundaries of the Adverse Domination Doctrine: Is there any Repose for Corporate Directors?, 143 U. Pa. L. Rev. 1065, 1101-1103 (1995), and cases cited (while pure disinterested majority test would toll statute of limitations "per se" once "plaintiff has shown that the corporation is governed by a board of directors, the majority of whom are culpable," pure complete domination test "forbids the application of the adverse domination doctrine unless the plaintiff proves

more readily comports with other areas of corporate law, and properly balances the public policy interests of a statute of limitations.

There are at least two significant and related rationales for the adverse domination doctrine. First, it would be unfair to allow the statute of limitations to run where a plaintiff — in these circumstances the corporation — is unable to file suit against the alleged wrongdoers because those wrongdoers refuse to allow the corporation to act in its own interest. See, e.g., *In re Marvel Entertainment Group, Inc.*, 273 B.R. 58, 75 (Bankr. D. Del. 2002) ("The premise underlying the adverse domination doctrine is that a corporation acts through its board of directors, and when that board of directors is controlled by culpable directors it will not cause the corporation to bring a lawsuit against themselves"); *Federal Deposit Ins. Corp.* v. *Howse*, 736 F. Supp. 1437, 1441 (S.D. Tex. 1990), quoting *Federal Deposit Ins. Corp.* v. *Hudson*, 673 F. Supp. 1039, 1042 (D. Kan. 1987) ("wrongdoers cannot be expected to bring an action against themselves"). Second, where the agents of a corporation who know of the injury are themselves the wrongdoers, we should not impute the agents' knowledge to the corporation — thus leaving the wrong undiscovered by the potential plaintiff. See, e.g, *Hecht* v. *Resolution Trust Corp.*, 333 Md. 324, 345-346 (1994) (doctrine premised on understanding that knowledge of claim by defendant directors "cannot reasonably be imputed to the corporation [because an] agent cannot reasonably be expected to act upon or communicate knowledge of his own wrongdoing to the corporation. Therefore, in most cases, corporate board members and officers control the corporation and constitute an insuperable barrier to a corporation's ability to acquire the knowledge and resources necessary to bring suit against the directors and officers. . . . The doctrine of adverse

that every member of the board was involved in the domination — that the board was completely numerically dominated"). It is true that certain jurisdictions have, respectively, adopted less than pure articulations of each test, and these articulations sometimes appear differentiable only in the placement of the burden of proof. Compare, e.g., *Hecht* v. *Resolution Trust Corp.*, *supra* at 347, with *International Rys. of Cent. Am.* v. *United Fruit Co.*, 373 F.2d 408, 414 (2d Cir.), cert. denied, 387 U.S. 921 (1967) (*United Fruit*). See generally Comment, *supra* at 1101-1104. Nonetheless, we find a considerable difference between the two tests.

domination presumes that actual notice will not be available until the corporate plaintiff is no longer under the control of the erring directors").

A corporation cannot act, or receive information, except through its agents. However, restricting the definition of corporate agents, in this context, to a majority of a board of directors, does not accord with the realities of modern corporate law. This court has long recognized the ability of shareholders, in certain situations, to act for the corporation. See, e.g., *Bartlett* v. *New York, N.H. & H.R.R.*, 221 Mass. 530, 530-532 (1915). Most relevant here, a corporate shareholder who discovers that directors or officers have injured a corporation may, in many cases, bring a derivative suit on that corporation's behalf. See *Harhen* v. *Brown*, 431 Mass. 838, 842-845, 848-849 (2000). See also Mass R. Civ. P. 23.1, 365 Mass. 768 (1974) (derivative action may be "brought by one or more shareholders . . . to enforce a right of a corporation").[24]

The mere existence of a majority of culpable directors should not lead to a presumption that a corporate plaintiff is unable to discover or redress the wrongs perpetrated by such directors, thereby tolling a statute of limitations established by the Legislature to "provide the temporal finality necessary for the orderly conduct of human affairs." *Doe* v. *Harbor Schs.*, 446 Mass. 245, 256 (2006). Statutes of limitation "represent society's considered . . . compromise between a plaintiff's need to remediate wrongs and society's need for closure and forward movement." *Id.* We will not disrupt such a considered compromise, absent significant unfairness. Cf. *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 205 (1990) ("This court has recognized the unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another. We, therefore, have developed [in the absence of a governing statute] a discovery rule for the purpose

[24]In addition, depending on a corporation's bylaws or articles of incorporation, even a single director who is not a stockholder may be entitled to bring a suit on behalf of the corporation regardless of the wishes of the remainder of the board. See, e.g., *Federal Deposit Ins. Corp.* v. *Henderson*, 61 F.3d 421, 426 n.10 (5th Cir. 1995); *Resolution Trust Corp.* v. *Acton*, 866 F. Supp. 981, 985-986 (N.D. Tex. 1993).

of determining . . . when the statute of limitations starts to run").

We conclude that the statute of limitations should toll only where a plaintiff can show that the culpable directors (or officers) completely and exclusively controlled the corporation. Or, as Judge Henry J. Friendly, writing for the United States Court of Appeals for the Second Circuit, so aptly put it, "once the facts giving rise to possible liability are known, the [representative] plaintiff must effectively negate the possibility that an informed stockholder or director· could have induced the corporation to sue." *United Fruit, supra* at 414.

The concerns justifying the application of the adverse domination doctrine are substantially mitigated where an informed, disinterested director is also a shareholder in the corporation. Where such a person "could have induced the corporation to sue," *id.*, it cannot be said that the corporation is barred from seeking redress of the injury to it, and there is no longer a good reason to refuse to impute that person's knowledge of the wrongdoing to the corporation itself. Accord *Clark* v. *Milam*, 872 F. Supp. 307, 313-314 (S.D.W. Va. 1994) ("It is well-established that shareholders bringing a derivative suit do so *on behalf of the corporation*. It stands to reason . . . [that] [f]or statute of limitations purposes, the shareholders' knowledge of wrongdoing constitutes discovery *by the corporation* of that same wrongdoing" [emphasis added]); *In re Marvel Entertainment Group, Inc., supra* at 76 ("when disclosures of the alleged harmful acts are made to shareholders, the corporate entity is no longer without redress against those who control it because the shareholders have both the knowledge and authority to protect the corporation's rights, and . . . therefore, there is no reason to toll the statute of limitations").[25]

Joy, however, draws our attention to the requirement in *United*

---

[25]We recognize, as suggested in *Hecht* v. *Resolution Trust Corp.*, 333 Md. 324 (1994), that culpable directors or officers have significant ability to conceal (or to breach their duty to reveal) injury they caused from discovery by persons who could otherwise act on behalf of the corporation. See *id.* at 350-352. However, our doctrine of fraudulent concealment provides for the tolling of the limitations period in such circumstances. Accord *Federal Deposit Ins. Corp.* v. *Henderson, supra* at 430 ("Although we recognize that the risk of concealment is a principal rationale behind the general theory of adverse

*Fruit, supra* at 414, that the director or shareholder "could have induced the corporation to sue," and argues that *United Fruit* found such potential inducement only because it concluded that a petition from an informed shareholder to the board could have, because of several case-specific factors, caused the board to authorize the corporation to sue. This requirement, she contends, is not met in the present case because a demand on the board clearly would not have "induced" it to allow the corporation to sue three of its four directors.

We do not read *United Fruit* so narrowly.[26] The rule described by Judge Friendly does not require that an informed director or shareholder be able to induce *the board* to allow the corporation to sue. Rather, the rule focuses on that person's ability to induce *the corporation* itself to sue. Thus, where a shareholder or director, see note 23, *supra*, can sue on the corporation's behalf in spite of resistance by the board, numerical control of the board is largely irrelevant for purposes of the analysis. Cf. *Resolution Trust Corp.* v. *Fleischer*, 826 F. Supp. 1273, 1277-1278 (D. Kan. 1993) (where majority of board culpable, potential suit on behalf of corporation by State commissioner does not negate adverse domination only because he "does not stand in the same shoes as would an informed, disinterested director or shareholder" and "does not have the same incentives or abilities to bring a suit on behalf of an institution as would outside directors or shareholders of the institution").

Here, the judge concluded that Joy would have been excused from the usual requirement that a shareholder must make demand on a corporation's board before bringing a derivative suit. Joy does not challenge this conclusion and we see no reason to question its correctness. Joy did not need the board's permission to induce DeLuca's to sue the other directors.

Consequently, the relevant inquiry is whether the informed

domination, . . . Texas law already adequately prevents a dominant director from benefiting from such deliberate acts under the tolling doctrine of fraudulent concealment").

[26]As Joy notes, *United Fruit, supra* at 416, left "for another day the more difficult question whether or under what circumstances the mere possibility of suit by an informed stockholder or director would end tolling." Thus, at the very least, *United Fruit* acknowledged the possibility that its articulation of the doctrine would end tolling in such a situation.

director or shareholder (or in this case director and shareholder) can induce herself (as a representative of the corporation) to sue. To determine this, a judge must explore the ability and willingness of the party to bring suit, which often involves consideration of practical factors including the party's financial wherewithal to sue, the extent of the party's interest or investment, and, perhaps, any emotional and physical intimidation on the part of the culpable officers or directors that might cause the party to refrain from proceeding. See *Farmers & Merchants Nat'l Bank* v. *Bryan*, 902 F.2d 1520, 1523 (10th Cir. 1990) ("plaintiff may . . . demonstrate adverse domination by proving that an informed director [or shareholder], though capable of suing, would not do so"); *Clark* v. *Milam, supra* at 314 (adverse domination doctrine "must take into consideration [that] shareholders are merely *acting* as the corporation pursuant to a legal fiction, and may have very limited interests or goals"; "[i]f the shareholders have no interest in redressing the wrongs, there will be no one to protect or advance the corporate causes of action"); *Clark* v. *Milam*, 192 W. Va. 398, 404 (1994) ("doctrine tolls the statute of limitations so long as there is no one who knows of and is able and willing to redress the misconduct of those who are committing the torts against the corporate plaintiff").

Joy presented no evidence to the receiver or the judge that she was somehow unable or unwilling to bring suit on behalf of DeLuca's against her brothers. To the contrary, according to the uncontested facts set out in the receiver's reports, "Joy was not without the means or inclination to sue her brothers . . . when it suited her pecuniary interest . . . ." Having failed to "negate the possibility that an informed stockholder or director could have induced the corporation to sue," *United Fruit, supra* at 414, Joy has not met her burden of showing that her brothers completely dominated the corporation in the manner necessary to toll the statute of limitation on her claims.[27] The claims she

---

[27]Joy contends that even if the statute of limitations is not tolled under the adverse domination doctrine, it is tolled under our repudiation of trust and fraudulent concealment doctrines. On the facts of this case, we disagree. Joy points to *Demoulas, supra* at 522-523, where we said: "The primary responsibility to protect the interests of a corporation rests with its officers

asserts were time barred and the entry of final judgment was proper.[28]

*Judgments affirmed.*

---

and directors, and the limitations period should not run until disinterested and independent directors are in a position to act in the corporation's behalf against corporate wrongdoers. Therefore, when a corporation is the injured party in a shareholder derivative suit, the repudiation of trust and fraudulent concealment doctrines prevent the statute of limitations from running until knowledge is gained by those who have the power and responsibility to act on the corporation's behalf and who are not themselves involved in the wrongdoing that is the basis for the cause of action." However, in the present case, Joy, as a director, was responsible for protecting the interests of the corporation and had actual knowledge of the wrongdoing. In addition, she was a shareholder in a demand excused position and therefore was able to act on behalf of the corporation. Nothing we said in *Demoulas* would toll the statute of limitations for Joy.

[28]Joy's appeal is also predicated on questions concerning the scope of the corporate opportunity doctrine. However, as the receiver found, in 1995 and 1996, "Joy and her accountant questioned . . . whether corporate opportunities were diverted, particularly with respect to the Back Bay and Belmont stores, whether Joy should have been given interests in or the opportunity to participate in the brothers' various real estate transactions, and questions concerning Salina, Winchester Produce and Cherokee and other 'side businesses' that had been formed or were being run by her bothers. These issues were discussed at length without resolution at the 1996 Board meeting . . . and thereafter." As with Joy's other claims, these claims were time barred, although we note that the receiver did award Joy compensation for at least one such missed opportunity (DeLuca's Market Back Bay). That award, however, has not been appealed.