ROBERT COLLAMORE VS. OFFICE OF CAMPAIGN AND
POLITICAL FINANCE & another.[1]

No. 05-P-991.

Suffolk. April 10, 2006. - September 13, 2006.

Present: KANTROWITZ, DOERFER, & COHEN, JJ.

*Massachusetts Clean Elections Law. Elections,* Political contributions. *Statute,*
Construction. *Administrative Law,* Agency's authority, Substantial
evidence.

Where a candidate for public office had obtained "clean elections" funds for
his campaign pursuant to a judgment and execution issued by the Supreme
Judicial Court, which conditioned the receipt of funds upon their treatment
as clean elections funds for all purposes under G. L. c. 55A, the office of
campaign and political finance had jurisdiction to pursue a petition alleg-
ing that the candidate had falsified reports of qualifying contributions and
to enforce the requirements of G. L. c. 55A, § 16, by decertifying the
candidate, ordering the return of the funds that he had received, and impos-
ing a fine. [321-322]
Evidence introduced at a hearing before the office of campaign and political
finance (OCPF), which demonstrated that a political candidate (or his com-
mittee) had knowingly submitted false reports of campaign contributions,
was sufficient to support the OCPF's decision to decertify the candidate as
a "clean elections" candidate. [322-324]

CIVIL ACTION commenced in the Superior Court Department on
October 4, 2002.

A motion for partial summary judgment was heard by *Mitch-
ell J. Sikora, Jr.,* J., and a motion for judgment on the pleadings
was heard by *Elizabeth M. Fahey,* J.

*Evan Slavitt* for the plaintiff.

*Peter Sacks,* Assistant Attorney General, for the defendants.

COHEN, J. During the brief life span of the "clean elections"
law, G. L. c. 55A, §§ 1 et seq.,[2] repealed by St. 2003, c. 26,
§ 43(C), Robert Collamore received public funds for his 2002

---

[1]Director of the office of campaign and political finance.

[2]All references in this opinion to provisions of the clean elections law were

campaign for the office of State Representative. He appeals from a judgment of the Superior Court affirming a decision by the office of campaign and political finance (OCPF) decertifying him as a clean elections candidate, ordering him to reimburse the funds he received, and imposing a fine. At issue is whether the OCPF had jurisdiction over this matter, and if so, whether its decision was supported by substantial evidence. We affirm.

1. *Background.* a. *The clean elections law.* On November 3, 1998, the people of the Commonwealth approved the clean elections law under the initiative provisions of art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution. See St. 1998, c. 395 (inserting G. L. c. 55A and amending related statutes). The clean elections law provided that candidates for State or Statewide offices who voluntarily agreed to limitations on campaign contributions and expenditures and who received a sufficient number of "[q]ualifying contributions" would be entitled to receive designated amounts of public funds for their primary and general election campaigns. See G. L. c. 55A, §§ 6, 7.

The source of these funds was to be the Massachusetts clean elections fund. See G. L. c. 55A, § 1. See also G. L. c. 10, § 42. However, money set aside for this purpose was not appropriated by the Legislature, and eventually, the clean elections law was repealed, effective July 1, 2003.[3] In 2002, as a result of the Supreme Judicial Court's decision of *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144 (2002), candidates certified as clean elections participants by the OCPF were able to obtain money for their campaigns by way of judgments against the Commonwealth.

To count as a qualifying contribution, a campaign donation

inserted by St. 1998, c. 395, § 2.

[3]Despite the repeal of the clean elections law, this case is not moot because it concerns a penalty or forfeiture under the law as it once stood. See G. L. c. 55A, § 16(c), (e). "The repeal of a statute shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, prosecution or proceeding pending at the time of the repeal for an offence committed, or for the recovery of a penalty or forfeiture incurred, under the statute repealed." G. L. c. 4, § 6, Second, inserted by St. 1967, c. 867, § 1.

was required to be in an amount between five and one hundred dollars, given by a registered voter in the geographic area served by the office in question, and collected by the candidate during a designated "[q]ualifying period." See G. L. c. 55A, § 1. Each donation also had to be accompanied by a signed and dated statement from the contributor, indicating that the contributor wished the candidate to be eligible for clean elections funds. *Ibid.* After demonstrating receipt of the requisite minimum number of qualifying contributions, the candidate would become eligible to be certified by the OCPF as a clean elections candidate and to receive clean elections funds. See G. L. c. 55A, § 4. However, the candidate could be decertified, fined, and required to repay the funds received if the OCPF later determined, after notice and opportunity for a hearing, that the candidate knowingly submitted false reports of qualifying contributions. See G. L. c. 55A, § 16.

On February 25, 2002, the Supreme Judicial Court issued its decision in the *Bates* case, a lawsuit initiated by supporters of the clean elections law in the Supreme Judicial Court for Suffolk County, pursuant to G. L. c. 214, § 1. On report by a single justice to the full bench, the court held that the Legislature had failed to fulfil its constitutional duty under art. 48 to appropriate funds to carry the clean elections law into effect, *Bates, supra* at 168, and directed the single justice to enter a money judgment in favor of the one candidate who was then certified as a clean elections candidate, *id.* at 178-179. The court also directed the single justice to retain jurisdiction to grant relief to any other candidate plaintiff who qualified under the clean elections law and to allow additional candidate plaintiffs to become parties to the case. *Ibid.* Addressing the possibility that the judgment might not be satisfied voluntarily, the court observed that the single justice had "broad discretion to consider such other and further remedies as she deems necessary and appropriate." *Id.* at 179.

As anticipated by the court, other certified candidates became parties to the *Bates* case and obtained judgments against the Commonwealth. When the Legislature still did not appropriate money to satisfy the judgments, the single justice issued executions whereby property belonging to the Commonwealth was

seized and auctioned. Additional money to satisfy the judgments eventually was appropriated. See St. 2002, c. 184, § 174.

b. *Collamore's receipt of clean elections funds.* In 2002, Collamore was a candidate for the office of State Representative in the Twelfth Hampden District. On February 20, 2002, Collamore filed a "Form CE 1: Declaration of Intent" with the OCPF, signifying his desire to become a clean elections candidate. See G. L. c. 55A, § 5. Between February 20, 2002, and May 28, 2002, his qualifying period,[4] Collamore was required to obtain at least 200 qualifying contributions.

On May 23, 2002, Collamore filed a "Form CE-3: Application for Certification" with the OCPF. See *ibid.* He also submitted completed forms CE-2 and CE-2L,[5] which purported to contain the signatures of 282 registered voters in the Twelfth Hampden District who had made contributions to his campaign and who supported his effort to be certified as a clean elections candidate. See *ibid.* On May 28, 2002, the OCPF approved 246 of the contributions relied upon by Collamore. By letter of that date, the OCPF notified Collamore that he was certified as a clean elections candidate, but that no distribution could be processed because the Legislature had not made any appropriation for this purpose. The letter called his attention to the *Bates* case, suggested that he obtain legal counsel, and concluded by stating, "[Y]ou should be aware that any funds received as a result of a judgment against the Commonwealth should be treated, reported and used in the same manner as if received from [the] Massachusetts Clean Elections Fund. Such funds received are regulated by [G. L.] c. 55A and . . . 970 [Code Mass. Regs. §]5:00." The same advice and conditions were reiterated in another letter from the OCPF to Collamore, dated June 3, 2002, in which the OCPF informed Collamore that he was entitled to additional funds because he was opposed in his party's primary election.

On May 31, 2002, the single justice allowed Collamore's

---

[4]The maximum qualifying period for candidates for the office of State Representative was the period from January 1, 2002, through May 28, 2002. G. L. c. 55A, § 1. Because Collamore filed his declaration of intent on February 20, 2002, his qualifying period started on that date.

[5]Form CE-2 was used to record the signature of an individual contributor. Form CE-2L was used to record the signatures of multiple contributors.

motion to intervene in the *Bates* case, with the assent of the OCPF and the other parties. The single justice also allowed Collamore's assented-to motion for a money judgment in the amount of $8,100, the initial amount of funds for which he was found eligible. This latter motion was accompanied by a proposed judgment stating that both Collamore and the director of the OCPF, Michael J. Sullivan, were "ORDERED to treat any and all proceeds of this judgment as 'clean election[s] funds,' as defined by G.L. c. 55A, § 1, for all purposes under G.L. c. 55A."

Judgment entered on June 5, 2002, in the form proposed. On June 12, 2002, Collamore obtained a second judgment, for a second payment of $8,100, again with the assent of the OCPF and the other parties. Again, as also stated in his proposed judgment, the actual judgment entered by the court stated that he and the director of the OCPF were "ORDERED to treat any and all proceeds of this judgment as 'clean election[s] funds,' as defined by G.L. c. 55A, § 1, for all purposes under G.L. c. 55A." Thereafter, Collamore's two judgments, totaling $16,200, were satisfied as a result of the seizure and the auction of State property, pursuant to executions issued by the single justice.

c. *Collamore's decertification.* On June 11, 2002, a competing candidate for the Twelfth Hampden District seat, the incumbent, State Representative Gale D. Candaras, petitioned the OCPF, seeking to have Collamore decertified as a clean elections candidate because he had falsified reports of qualifying contributions. The petition alleged that of the 246 individuals whose donations were counted as qualifying contributions, twenty-seven were not registered voters in the district, and nineteen others had stated that they did not contribute to Collamore's campaign and that their signatures were forged. In support of her petition, Candaras submitted affidavits, and a letter from Paul McDonald, whom she retained as a handwriting expert.[6]

Collamore's initial response was that the OCPF lacked

[6]Candaras also filed a complaint in the Hampden Superior Court, Candaras & another *vs.* Collamore & another, Hampden Superior Court, No. 02-614 (June 11, 2002), alleging that Collamore and the OCPF violated the clean elections law by submitting and certifying falsified contribution reports. The

jurisdiction to pursue the petition because he had obtained his funds pursuant to a judgment and execution issued by the Supreme Judicial Court. Collamore asserted that "the executive cannot interfere with the jurisdiction or power of the courts to issue judgments and executions. Accordingly, as long as a judgment in his favor is extant, [the] OCPF has no authority over [his] receipt of [c]lean [e]lections funds." When the OCPF rejected this position, Collamore made an additional response denying the factual allegations against him.

The OCPF proceeded to investigate the petition by contacting people whose signatures had been called into question. Seventeen of the twenty people called by the OCPF stated that they had not contributed to Collamore. On August 22, 2002, the OCPF issued a "Notice of Intent to Decertify and Impose Fines," pursuant to G. L. c. 55A, § 16. A hearing was held over two days in September, 2002, with the OCPF director, Michael J. Sullivan, presiding. During the hearing, several witnesses testified, including Collamore. As permitted by OCPF rules, the hearing officer also considered evidence received by affidavit.

On September 26, 2002, the OCPF issued a lengthy decision concluding that "Collamore and/or his political committee, i.e., the 'participant,' falsely reported numerous qualifying contributions and that such activity was done knowingly." Under the authority of G. L. c. 55A, § 16, the OCPF decertified Collamore; ordered him to return the $16,200 distributed to him, with interest, to the Massachusetts clean elections fund; and imposed a fine.

Collamore sought review of the OCPF decision in the Superior Court, under G. L. c. 30A. He raised his jurisdictional arguments in a motion for summary judgment, which was denied by the motion judge in a decision entered April 20, 2004. Collamore then filed a motion for judgment on the pleadings, pursuant to G. L. c. 30A, § 14(7). On February 17, 2005, this motion, too, was denied, in a decision issued by a second judge who had reviewed the administrative record and concluded that the OCPF decision was supported by substantial evidence. This appeal ensued.

action was stayed pending the outcome of this case.

2. *Discussion.* a. *Jurisdiction.* Collamore makes two points in support of his position that the OCPF lacked jurisdiction: (1) that, given their source, the funds he received were not clean elections funds that the OCPF could order returned under G. L. c. 55A, § 16(*c*)[7]; and (2) that the OCPF's decertification action was in derogation of the authority of the Supreme Judicial Court. Neither point has merit.

Collamore's first point flies in the face of the judgments entered by the single justice, who expressly ordered both Collamore and the OCPF to "treat any and all proceeds of this judgment as 'clean election[s] funds,' as defined by G.L. c. 55A, § 1, for all purposes under G.L. c. 55A." Collamore does not appear to contest the indisputable authority of the single justice to include this condition in the judgments.[8] Instead, Collamore claims that this proviso was meant to refer only to those sections of c. 55A relating to the expenditure of funds and limitations on outside fund raising, but not to § 16(*c*). However, Collamore's interpretation of the judgments is directly contradicted by their plain language. The judgments ordered that the money he received be treated by him and the OCPF as clean elections funds for *all* purposes under c. 55A. Accordingly, the monies he received were clean elections funds for purposes of § 16(*c*).[9]

---

[7]The statute states in relevant part: "Any participant decertified pursuant to this chapter . . . shall forfeit and return, with interest from date of receipt to date of return at the rate computed as specified in section 61 of chapter 231, all clean election[s] funds which said candidate has received. Funds forfeited and all applicable interest returned by a decertified candidate shall be deposited in the Massachusetts Clean Elections Fund." G. L. c. 55A, § 16(*c*).

[8]In any event, such an argument would run afoul of the doctrine of judicial estoppel. Because Collamore took the position that judgments containing this condition were proper, it would be inequitable to permit him to take a contrary position now. See *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-641 (2005); *Aiello* v. *Aiello*, 447 Mass. 388, 399 (2006).

[9]Collamore's emphasis upon the fact that he did not receive his funds from the Massachusetts clean elections fund is particularly disingenuous given that he had been told by the OCPF in its letters of May 28, 2002, and June 3, 2002, that any money he might obtain as a result of a judgment against the Commonwealth should be treated "as if received" from the Massachusetts clean elections fund. The conclusion is inescapable that Collamore's proposed judgments, which were submitted with the cooperation and assent of the OCPF, were phrased to effectuate that intent.

Collamore's second point fares no better. The nub of his argument is that because he received his funds pursuant to orders of the Supreme Judicial Court, the OCPF lacked the authority to "disturb" these orders without first obtaining the court's permission. Again, Collamore's position is contradicted by the express terms of the judgments. By ordering that the OCPF, as well as Collamore, treat the funds he received as clean elections funds for all purposes under c. 55A, the single justice confirmed the continuing regulatory authority of the OCPF over those funds, regardless of their source. Thus, when the OCPF undertook to enforce the requirements of c. 55A, § 16, by decertifying Collamore, ordering the return of the money he received, and imposing a fine, it was acting in accordance with — and not in derogation of — the court's orders.

b. *Sufficiency of the evidence.* Whether the evidence introduced at the OCPF hearing was sufficient to support decertification is subject to the deferential standard of review applicable to agency decisions. The agency's decision will be upheld if it is supported by substantial evidence, defined as "such evidence as a reasonable mind might accept as adequate to support the agency's conclusion." *Seagram Distil. Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 713, 721 (1988). See G. L. c. 30A, § 1(6) (defining substantial evidence). In assessing the agency's decision, we show particular deference to credibility determinations and inferences drawn from the facts. See *Hotchkiss* v. *State Racing Commn.*, 45 Mass. App. Ct. 684, 696 (1998).

Under the clean elections law, decertification was required if the participant, defined in G. L. c. 55A, § 1, as "the candidate and the candidate's committee," was shown to have "falsely report[ed] any expenditure or contribution," G. L. c. 55A, § 16(*a*)(3), and to have done so "knowingly," *ibid.* Here, there was substantial evidence as to each of the required elements.

With respect to the falsity of Collamore's reports, the hearing officer had before him the affidavits of more than fifteen individuals who stated that they neither had made a contribution to Collamore nor had signed a contribution form for him. One purported signatory did not submit an affidavit, but affidavits from both his sister and his brother established that he had not

been in Massachusetts for several years, that he could not have signed the contribution form at the time claimed by Collamore, and that the signature appearing on the form was not in his handwriting.

The contribution forms themselves also were introduced in evidence. The hearing officer examined them and found that the signatures purporting to be those of the affiants did not resemble the signatures on their affidavits. Based upon his observations, and even without expert testimony, the hearing officer was entitled to conclude that the affiants' signatures on the forms were not genuine.[10] See *Commonwealth* v. *O'Connell*, 438 Mass. 658, 662-663 & n.8 (2003).

The hearing officer also was entitled to credit the expert testimony of handwriting expert Paul McDonald[11] that as many as 137 signatures on Collamore's forms were not genuine, as revealed by misspellings and inconsistencies with signatures maintained in voter registration records. On the basis of this testimony, the hearing officer was warranted in finding, as he did, that there was a widespread pattern of falsification in Collamore's submissions.

There also was substantial evidence to support the finding that Collamore "and/or his political committee" submitted the false reports "knowingly." It was established that only a small group of people were involved in gathering the contributions and signatures: Collamore, his wife, his brother, his sister, and a

---

[10]Under rule 10(e) of the OCPF procedural rules, adopted under the authority of 970 Code Mass. Regs. § 3.05(e) (1986), the hearing officer was entitled to rely upon evidence submitted in affidavit form. However, he also received similar evidence through live testimony. Many of the affiants were subpoenaed to the OCPF hearing at Collamore's request, and six of them testified. The hearing officer found that three of the witnesses, whose testimony mirrored their affidavits, were entirely credible. While he described two other witnesses as less persuasive, he found that they, too, falsely had been included in Collamore's reporting. The hearing officer rejected the testimony of one witness because of his strained personal relationship with Collamore. Collamore released the remaining witnesses without calling them to testify.

[11]It is evident from the OCPF decision that the hearing officer considered McDonald to be qualified in handwriting identification. The record established that McDonald is a certified document examiner and former State police officer whose experience included more than thirteen years as a criminal investigator, and that, prior to the hearing, he had testified regarding handwriting analysis or document examination "approximately six or seven times."

few of his friends. Moreover, Collamore testified at the hearing that he himself had obtained contributions and signatures from three individuals who, the hearing officer found, had not made contributions or signed Collamore's forms. An unchallenged affidavit from another individual, who denied contributing, recounted how he had received a telephone call from one of Collamore's campaign workers, who apologized on behalf of the Collamore campaign for the fact that campaign workers had signed the names of the affiant and his wife on Collamore's clean elections forms. The campaign worker explained that certain other campaign workers had become "overaggressive" in their effort to obtain signatures. Finally, the sheer extent of the falsification — which, according to the expert testimony, involved as many as 137 suspect signatures — provided additional support for the determination that "Collamore and/or his political committee" knowingly submitted false reports of contributions.

In questioning the soundness of the OCPF decision, Collamore relies heavily upon his own testimony denying knowledge of any wrongdoing. However, the hearing officer found that Collamore was not credible, based on his demeanor, his argumentative responses to questions, and the existence of significant inconsistencies between his hearing testimony and the testimony he gave during a deposition. We see no basis for rejecting this credibility determination.

3. *Conclusion.* The OCPF had jurisdiction over this matter and reached a decision supported by substantial evidence. The amended judgment of the Superior Court, affirming the decision of the OCPF is, accordingly, affirmed.

*So ordered.*